## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ORA COHEN, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | Civil Action No. 1:12-cv-01496 |
| v. | ) | |
| | ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT

## I.  INTRODUCTION

This action seeks damages for acts of state-sponsored terrorism that resulted in a terrorist attack upon a bus crowded with people in the Shmuel Ha-Navi neighborhood in Jerusalem, Israel on August 19, 2003. Specifically, on August 19, 2003, Ora Cohen ("Ora") and her then-husband Shalom Cohen ("Shalom") traveled to the Kotel or "Western Wall" for their ninth wedding anniversary along with their five minor children Meirav Cohen (7 years old), Daniel Cohen (6 years old), Orly Cohen (4 years old), Shira Cohen (1 year old) and newborn Elchanan Cohen (1 month old). After spending the day at the Kotel, the Cohen family boarded the Number 2 Egged bus to travel home to their apartment in Jerusalem, Israel. The bus was extremely crowded and, therefore, the members of the Cohen family had to split up in order to find seating.

Raed Misk, a member of Hamas's Qassam Bridades terrorist wing, boarded the Number 2 bus at a stop in the Shmuel Ha-Navi neighborhood in Jerusalem, Israel and detonated a bomb strapped to his body.  The explosion killed 23 people (7 children; 16 adults) and wounded over 130 more, including each member of the Cohen family. In the chaos following the terrorist attack, the members of the Cohen family were separated and sent to the hospital without any knowledge about whether their loved ones survived the attack. The family waited hours, fearing the worst, until they finally learned that Ora, Shalom and their three oldest children were all alive and at the same hospital. Hours later, Ora learned from a woman that her two youngest children, Shira and Elchanan were at another hospital: alive but in serious condition. Due to their injuries, the rest of the Cohen family were not able to be reunited with Shira or Elchanan until approximately a week later.

This terrorist attack was carried out by the terrorist organization Hamas, operating with material aid and support provided by the Islamic Republic of Iran, the Iranian Revolutionary

Guards Corps (IRGC) and the Iranian Ministry of Information and Security (MOIS)(collectively "Defendants" or "Iranian Defendants"). In the years leading up to the August 19, 2003 attack, the Iranian Defendants, acting through its principals, aided and abetted and conspired with Hamas to engage in acts of terrorism. Defendants provided this support to Hamas with the knowledge and intent that such support would be used for terrorist attacks against Israeli and American interests.

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, (FSIA), codified as 28 U.S.C. § 1602, *et seq*. On January 22, 2016, the Court held a hearing on liability and damages in accordance with 28 U.S.C. § 1608(e). For the reasons set forth more fully below, Plaintiffs are entitled to redress for their injuries under the FSIA.

## II. FINDINGS OF FACT

### A. The Iranian Defendants Provided Material Support to Hamas

The government of the Islamic Republic of Iran ("Iran") has a long and established history of providing material aid and support to terrorist organizations. Iran has provided material support to Hamas, the terrorist organization that claimed responsibility for the August 19, 2003 attack that injured Plaintiffs, since at least 1993. (1; Clawson Affidavit at 10). Iran has historically provided material support for terrorism through the Iranian Revolutionary Guard Corps (IRGC) a military organization tasked with defending the Iranian revolution. *Id*. at 5. The IRGC is "dedicated to the spread of fundamentalist Islamist principles throughout the world." *Id*. at 6. A specific branch within the IRGC known as the "Qods Force" is charged with foreign operations including the provision of material and logistical support to insurgents and terrorist organizations targeting United States forces and interests and "prepar[ing] for battle against Israel." *Id*. at 6. "In addition to the IRGC, the other principal organization Iran has used to carry

2

out its terrorist support activities has been MOIS [the Iranian Ministry of Intelligence and Security], Iran's foreign and domestic intelligence service." *Id.* at 7.

IRGC and MOIS, as state institutions of Iran were consistently involved in the planning and execution of terrorist acts including the support of terrorist groups that use terrorism to pursue their goals. *Id.* at 8; *citing* the U.S. State Department's Patterns of Global Terrorism, 1999).

The United States Department of State ("State Department") has identified Iran as a state sponsor of terrorism since 1985. *Id.* at 8.  During the period of 1993 to 2004, the United States considered Iran "the premier state sponsor of terrorism" and "the most dangerous sponsor and the greatest source of concern to U.S. policymakers." *Id.* at 8-10; (Exhibit 6; Patterns of Global Terrorism 2001); (Exhibit 7; Patterns of Global Terrorism, 2002); (Exhibit 8; Patterns of Global Terrorism, 2003). In 2002, "Iran remained the most active state sponsor of terrorism" and the Iranian Revolutionary Guards Corps (IRGC) and the Iranian Ministry of Intelligence and Security (MOIS) "were involved in the planning of and support for terrorist acts and continued to exhort a variety of groups that use terrorism to pursue their goals." (Exhibit 7; Patterns of Global Terrorism: 2002 at 77). In providing support to terrorist organizations, including Hamas, the activities of IRGC and MOIS are "tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives." (Exhibit 1; Clawson Affidavit at 7).

**B.  The Iranian Defendants Relationship With Hamas**

Iran plays a critical role in funding, providing material support, arming and training Hamas operatives. (Exhibit 3; Declaration of Matthew Levitt ("Levitt Declaration") at 5, 12). Hamas could not function without the significant funding it needs to carry out its terrorist, political, and social activities. *Id.* at 12.

Hamas is a Palestinian Islamist group that emerged in 1987 with the mission of eliminating the State of Israel. *Id*. at 17; (Clawson Affidavit at 10). To achieve this goal, Hamas employs a three-pronged strategy:

(1) Social welfare activity that builds grassroots support for the organization;
(2) Political activity that competes with the secular Palestinian Authority (PA); and
(3) Guerilla and terrorist attacks that target Israeli soldiers and civilians.

(Levitt Declaration at 17). Since its founding, Hamas has committed countless acts of violence against both military and civilian targets, including suicide and other bombings, Qassam rocket, mortar fire and shooting attacks. *Id*. at 18. The number of Hamas attacks increased dramatically with the onset of the Second Intifada in September 2000. From September 29, 2000 through March 24, 2004, Hamas conducted over 425 terrorist attacks killing 377 people and wounding 2,076. *Id*. at 18 (Israeli Ministry of Foreign Affairs, March 22, 2004).

The attacks committed by Hamas are intended to terrorize and instill fear in the civilians who compromise the local population so that they will either leave or, at a minimum, pressure their leaders to give concessions to Hamas in order to stop the violence. *Id*. at 18. In the years leading up to the August 19, 2003 terrorist attack, Iran's Supreme Leader Ayatollah Ruhollah Khomeini continually referred to Israel as a "cancerous tumor" that must be removed. (Clawson Affidavit at 9).

Iranian funding is critical to helping Hamas bear the significant financial burden of underwriting its operations. *Id*. at 12. Iran provided "tens of millions of dollars" to Hamas in the years leading up to the August 19, 2003 attack. (Clawson Affidavit at 11); (Levitt Declaration at 6).[1] In 1999, the Palestinian police discovered documents that report that MOIS transferred $35

---

[1] Estimates of Iran's financial assistance to Hamas vary, however, there is a universal consensus that the total amount to millions of dollars each year. (Levitt Declaration at 6). As Dr. Clawson notes a July 30, 2003 report noted the Israeli Ministry of Foreign Affairs estimated that Iran

million to Hamas for the purpose of financing terrorist activities aimed at Israeli targets. *Id*. at 6. According to a December 2000 Palestinian intelligence report, Iran transferred $400,000 directly to Hamas's Qassam Brigades to specifically support the Hamas military arm in Israel and encouraging suicide operations. (Levitt Declaration at 8). The amount of financing provided by Iran to Hamas was dependent on the number of successful terrorist attacks carried out by the group. *Id*. at 7. Iran instituted an incentive system in which millions of dollars in cash bonuses [were] conferred to the organization for successful attacks. *Id*. (Clawson Affidavit at 11).

On May 19, 2000 the Iranian ambassador to Syria met with leaders of Hamas and other terrorist organizations in an attempt to increase the joint terrorist activity within Israel, the West Bank and the Gaza strip. *Id*. at 9. The meeting was held in response to a message from Iran demanding that the terrorist organizations "not allow a calming down [of the situation] at this period." *Id*.

As part of its agenda to challenge the West and target Israel, Iran actively trained Palestinian terrorist recruits, both directly and through Hezbollah, its primary terrorist proxy. (Levitt Declaration at 10). Hassan Salameh ("Salameh") a Hamas commander responsible for planning and carrying out suicide bombings in Israel in 1996 admitted that he received all of his military training in Iran. *Id* at 16. Salameh was transported to Iran from Syria upon an Iranian aircraft. Once in Iran, Salameh underwent three (3) months of military training by Iranian agents including how to use explosives, automatic weapons, hand grenades, shoulder-fired missiles, ambush techniques, how to deactivate land mines and extract their explosive material and how to build trigger mechanisms for bombs. *Id*. In receiving military training from Iran, Salameh was not alone. According to reports, Iran provided military aid and training for dozens of men in

provided Hamas with $3 million a year. (Clawson Affidavit at 11).

Hamas' military wing, the Izz al-Din al Qassam Brigades. (Levitt Declaration at 16).

**C.  Hamas Was Responsible for the August 19, 2003 Terrorist Attack**

In early August 2003, Majdi Za'atari a Hamas operative met with his commander in the military wing of Hamas for the purpose of finding a suitable location to carry out a suicide attack. (Levitt Declaration at 21). The two Hamas members identified the No. 2 Egged bus and chose an unsecured bus stop near the Novotel Hotel to detonate the bomb. *Id*. On August 19, 2003, Ra'ad Misk was sent by a commanding officer in Hamas to a predetermined location in order to receive instructions on how to activate the explosive belt. *Id*. at 22.  At the direction of the Hamas commanding officers, Misk was dressed in a manner that would allow him to pass as an Orthodox Jew. *Id*.  Around 9:10 pm, Misk boarded the No. 2 bus "fully packed with men, women and children" – including the Cohen family – and "blew himself up inside the bus." *Id*. at 23.  Hamas immediately claimed responsibility for the attack. *Id*. at 19.  Hamas released photographs of Misk posing with weapons, the text of Misk's living martyr's will and a video of Misk wearing the green headband of Hamas on the official website of Hamas's military wing "The Izz al-Din al Qassam Brigades – Information Office" *Id*. at 20.  Following the attack, Hamas identified Misk as a member of the Qassam Brigades and included him on its list of Martyrs. *Id.*  Several members of Hamas were convicted for their role in the bombing of the No. 2 Egged bus and ultimately admitted the responsibility of Hamas for the attack. *Id*. at 20-21.

**D.  Plaintiffs Ora Cohen, Shalom Cohen, Meirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, and Elchanan Cohen Each Suffered Serious Physical Injuries and Severe Emotional Distress As a Result of the  August 19, 2003 Terrorist Attack.**

Planitiff Ora Cohen, her husband Shalom Cohen, and each of their children, Meirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, and Elchanan Cohen suffered serious physical injuries and suffered severe emotional distress as a result of the August 19, 2003 terrorist attack.

Indeed, each family member was aboard the No. 2 Egged bus when the bomb exploded, causing serious emotional and physical injuries detailed below.

**1. Ora Cohen**: Oran Cohen testified before this Court on February 22, 2016. Her testimony is incorporated herein by reference.

**2. Shalom Cohen**: Shalom Cohen was Ora Cohen's husband at the time of the attack; Ora Cohen and Shalom Cohen have since divorced. Shalom Cohen's deposition is currently scheduled to take place on March 29, 2016. Plaintiffs will supplement the record in this case with Shalom's deposition testimony as soon as it is available.

**3. Meirav Cohen**: Meirav Cohen, born September 6, 1995, was seven (7) years old at the time of the August 19, 2003 terrorist attack. *See*, Deposition of Meirav Cohen, 2/17/16 at 10:5-6.[2] The entire Cohen family (Ora Cohen, Shalom Cohen, Meirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, and Elchanan Cohen) boarded the No. 2 Egged bus at about 9:00 PM on August 19, 2003 as they were leaving the Western Wall. *Id*. at 13:11-13. After boarding the bus and taking their seats, a huge explosion rocked the bus. *Id*. at 15:2-4. Meirav could not hear or see anything because the sound of the blast was so great. *Id.* at 15:2-15. The force of the blast caused Meirav to lose consciousness. *Id*. at 15:19-20.

Meirav awoke to a grim scene, as the floor of the bus below her had been reduced to a hole and the windows were broken. *Id*. at 15:23-16:6. She had dried blood all over her head and it was painful to move her head. *Id*. Eventually, a young man grabbed her and took her out of the bus. *Id*. at 16:18-17-1. On the way out of the bus, Meirav saw complete chaos and could only hear very faintly. *Id*. at 17:4-9. Meirav saw people running in the chaos following the blast and saw a police office helping a young woman who had her arm severed from the blast. *Id*. at 18:11-15. In the aftermath of the blast, Meirav witnessed injured victims sitting on the ground

---

[2] Plaintiffs' deposition transcripts, passports, and medical records will be filed with an updated Exhibit List shortly.

with their faces soaked with blood.  *Id*. at 19:9-15.  Meirav began to hear the faint calls of her father, Shalom Cohen.  *Id*. at 19:16-22. Meirav could only recognize her father because of the way he was standing; he was nearly unrecognizable because his face and neck were filled with shrapnel.  *Id*. at 19:16-20:5.  Shalom was holding Meirav's sister, Shira Cohen, in his arms; she looked "like a cloth of blood", distorted and miserable.  *Id*.  Meirav felt very afraid and confused.  *Id*. at 21:9-13.  Shortly thereafter, a young man took Meirav to an ambulance where she fainted.  *Id*. at 20:14-23.

Meirav awoke at the hospital where she was quickly connected to an infusion.  *Id*. at 21:16 -23.  Hospital staff brought Meirav's mother, Ora Cohen, into Meirav's room; Meirav could see that Ora's face was swollen, marked with scars and black stains next to her eyes.  *Id*. at 22:2-10.  Meirav could barely hear her mother because her ears were still damages from the blast; her body hurt everywhere and she was really confused.  *Id*. at 22:18-23:1.  After a few days, Meirav was finally reunited with her sister, Orly Cohen.  *Id*. at 23:2-4.  Meirav could see that Orly's hair was a "mess", she had bandages on her head and face, and that she looked "tiny and miserable."  *Id*. at 23:7-11.  Next, Meirav saw her brother Daniel; he had bandages on his face.  *Id*. at 23:18-19.  Meirav was finally able to see Elchanan three or four days later.  *Id*. at 24:8.  Elchanan was wrapped up in lots of layers; Meirav was simply told that it was Elchanan due to the state he was in.  *Id*. 24:11-13.  Meirav did not see her sister, Orly, for a long time (only after Orly came home).  *Id*. at 25:13-15.  When Orly came home, Meirav saw that her face was distorted; she had pieces of glass shards in her face, her eyes were bloodshot with open wounds, and her arms were filled with shards of glass.  *Id*. at 25:20-26:3.  Orly was hardly recognizable.  *Id*.

Meirav suffered significant injuries from the blast that last until present day, well over a

decade later.  Specifically, following the blast, Meirav could not hear anything and felt a strong pressure in her ears; it was very painful and she felt as if her ears were filled with blood.  *Id.* at 26:21-23.  Even today, Meirav cannot hear very well; she has to wear a hearing aid and needs to get another one.  *Id.* at 27:4-7.  Additionally, she needs to get a hearing implant for her left ear and has tinnitus (ringing in her ears).  *Id.* at 27:12-18.  Meirav's tinnitus "drives [her] crazy" she tries to go to sleep and she cannot concentrate well.  *Id.* She gets a headache and a really strong ear ache when she listens to music.  *Id.*  Even over a decade later, in 2016, Meirav still has pain and ringing in her ears.  *Id.* at 27:19-22.  Meirav also suffers from many painful ear infections.  *Id.* at 28:3-9.  When she has an ear infection, she cannot use the hearing aid and could not study; she was "hardly a student at all."  *Id.*  Additionally, due to the chance of infection, Meirav cannot go into water, which makes taking a shower a "nightmare."  *Id.* at 28:11-19.  Her doctors have told her that if she gets another ear infection, she could lose her hearing completely.  *Id.*

Additionally, Meirav's doctors have told her that she had an additional problem related to the attacks: when she is under stress, she goes through a post-traumatic episode and breaks out in eczema.  *Id.* at 29:13-18.

Meirav also experienced scarring on her face from the August 19, 2003 attack.  *Id.* at 30:24-31:1.  Even a decade later, Meirav still has scars on the right side of her face, her leg, and her arm.  *Id.* at 31:2-11.

Upon returning home from the hospital, Meirav's parents, Ora and Shalom, were "almost dysfunctional."  *Id.* at 33:24 – 34:2.  Her parents kept crying, they were hardly home, and had to go to therapy; the atmosphere at home was very sad and depressing, and Ora and Shalom were always screaming and crying at home.  *Id.* at 34:5 – 9.  Meirav's sister, Shira, would also cry as well.  *Id.* at 34:12-18.  Meirav's mother and father did not know what to do with Shira; Shira

underwent many operations and various treatments for her injuries, and did not look well at all. *Id*. Eventually, Meirav's father, Shalom, went "crazy" and was very angry constantly; the attacks caused him to lose his memory, among other things, and caused him to have outbursts of anger. *Id*. at 40:6-11. These outbursts caused Meirav's mother, Ora, to become angry, resulting in constant fights, confusion, and anger. *Id*. at 40:12-15. Before the bombing, Meirav did not recall any fights, outbursts, or anger between her parents. *Id*. at 40:16-24.

Following the attacks, Meirav also suffered psychologically. Specifically, Meirav could not sleep at night and would wet her bed. *Id*. at 35:15-18. She had many dreams every night and would wake up every few minutes, and would wake up every night from a "boom." *Id*. at 35:15-23. She even had recurring dream that she was going through a very long tunnel filled with blood and blood clothes; upon waking up, she had a sensation that she was colliding with a (baseball) bat and found that she had wet her bed, forcing her to sleep with her mother every single night. *Id*. at 35:24-36:6. This went on, every single night, forcing Meirav to be seen by a psychiatrist. *Id*. at 36:13-24. It was not until six months to a year after treatment that Meirav finally stopped wetting her bed at night. *Id*. at 37:1-4. Additionally, following the attacks and lasting for many years, Meirav did not want to go out and have fun; her behavior changed completely and she would hit people; nobody wanted to play with her because she would act out on her anger and throw tantrums. *Id*. at 41:11-24.

Among her family, everyone was concerned with Shira; she looked like a lifeless doll lying on the sofa, hardly breathing, not moving, and hardly talking. She was crying constantly because her eyes, face, and whole body hurt; she looked awful and terrible. *Id*. at 42:6-17.

In the years following the attack, life was terrible for Meirav and her family; Meirav's mother, Ora, could not help her children, her father, Shalom, completely changed and didn't

function at all; they felt lost and alone.  *Id*. at 43:20 – 44:5.  Life was so difficult for Meirav living at home that she moved out of her house at age 14 or 15.  *Id*. at 44:6-15.  Even today, her memories are stirred and she has repeated nightmares when she hears about terrorist attacks; without her psychologist, she would not be able to function at all and still sometimes has nightmares that something is exploding.  *Id*. at 47:1-24.  Since she lives in Israel, Meirav sometimes does not want to leave the house for fear of terrorist attacks.  *Id*.  She also experiences recurring dreams that someone is murdering her and the people that are close to her.  *Id*.  Even today, she still feels uncomfortable in crowded places and when she is out in public.  *Id*. at 48:11-23.

**4. Daniel Cohen**: Daniel Cohen, born May 8, 1997, was six (6) years old at the time of the terrorist attack on August 19, 2003.  *See*, Deposition of Daniel Cohen 2/17/16 at 7:3-4.  After boarding the Number 2 bus on August 19, 2003, Daniel Cohen took a seat next to his sister Meirav Cohen and across from his mother, Ora Cohen.  *Id*. at 8:9-16.  Daniel moved over to make room for two women boarding the bus when - the next thing that he remembers - he suddenly found himself outside of the bus (due to the terrorist bomb explosion), looking around without any knowledge of what had happened.  *Id*. at 8:9 – 9:4.  He felt like there was a hole next to his mouth, which was very painful.  *Id*.  He was very afraid and did not know what he was doing there.  *Id*.  He saw people roaming around and people crying in the aftermath of the bomb blast.  *Id*. at 10:7-12.  Eventually, he saw his mother, Ora Cohen, and his father, Shalom Cohen – both were crying.  *Id*. at 10:13-23.  Daniel's father, Shalom Cohen, had a lot of blood on his face and was taken to an ambulance.  *Id*. at 10:24 – 11:2.  Daniel's mother, Ora Cohen, looked like a "mess;" her hair was disheveled and she was on the floor crying.  *Id*. at 12:3-9.

Eventually, someone placed Daniel in an ambulance and he was taken to a hospital where

he was placed in a bed and his clothes were removed. *Id*. at 13:5-14. The hole near his lip was sewn up and his mother, Ora Cohen, came in to see him. *Id*. at 13:22 – 14:1. Ora Cohen has blood in her nose and was crying. *Id*. at 14:9-10. While in the hospital, Daniel had blood coming out of his ears, which was very painful, and could not get out of bed and could not walk. *Id*. at 15:14-18. Daniel developed scars on his legs from the shards and glass and shrapnel from the bomb blast. *Id*. at 16:3-8.

Daniel remembers when he first saw Shira; she looked "very changed" and had many scars on her face. *Id*. at 18:14-24. It was hard to look at her and was very sad. *Id*. at 19:1-4. He saw that half her face was covered in scars and one of her eyes was complete damaged. *Id*. at 19:5-10.

In addition to the bleeding in his ears, Daniel felt pain and pressure in his ears, as if something was "blocked" and developed ringing (a whistle sound) in his ears at night. *Id*. at 19:19 – 20:4. Today, his hearing is not so good; he can still hear ringing/whistling sounds in his ear that he hears every so often. *Id*. at 20:5-12. Loud noises are still very irritating for him. *Id.* at 21:1-5. Additionally, Daniel still has a scar from the bombing on his forehead, his leg, and his chin.

In school, Daniel became an introvert and was very quiet. *Id*. at 23:14-24. He was afraid of everyone and did not talk. *Id*. at 24:1-4. He was afraid of every bus that drove by and would turn around when he saw a bus nearby. *Id*. at 24:15-21. Additionally, he was fearful of very large, obese people because the terrorist behind the bombing was a very thick, large man (base don what Daniel was told). *Id*. at 24:24 – 25:8. After the first year after the attack, Daniel started to open up, but he began to act out in the 7th or 8th grade and started fighting with his friends; he became insolent to his teachers and rabbis. *Id*. at 29:5-12. At home, he would fight

and be "naughty;" he lacked discipline and began hitting his family members and his friends.  *Id*. at 29:13 – 30:3.  He had to go to arts and crafts therapy for treatment.  *Id*. at 33:1-4.

To this day, more than a decade after the attack in 2003, Daniel still suffers from insomnia; he cannot fall asleep and has difficulty sleeping, even when he is tired.  *Id*. at 25:21 – 26:10.  He wakes up from his sleep because he has fears of terrorists.  *Id*. at 26:11-14.

Currently, Daniel lives in Israel and becomes depressed, saddened, and frightened when he hears of a terrorist attack.  30:15 – 19.  He does not like to go out to public places where there are a lot of people because it stresses him out.  *Id*. at 30:22 – 31:1.  He still fears for himself and his family of terrorist attacks at night.  *Id*. at 31:2-7.

**5. Orly Cohen**: Orly Cohen, born April 9, 1999, was four (4) years old at the time of the August 19, 2003 terrorist attack on the Number 2 bus in Israel.  *See*, Deposition of Orly Cohen 2/17/16 at 7:21-24.  After the bombing, Orly remembers crying and screaming.  *Id*. at 9:8-9.  She began crying out for her mother, Ora Cohen.  *Id*. at 9:23 – 10:3.  She was then transported to the hospital.  *Id*. at 10:12-17.  Nurses did tests on her and treated her and Meirav.  *Id*. at 11:10 – 12:8.

Once she came home from the Hospital, Orly remembers that she was "pretty much alone;" her father and mother not really being there.  *Id*. at 13:14-18.  Her mother, Ora, would always look for someone to be with the kids, but she would have to go to treatment.  *Id*. at 13:19-23.  She felt as if there was nobody to take care of her; rather, girls would come over to take care of her.  *Id*. at 14:2-9.

Currently, Orly still has pain in her back and gets infections and swelling because there is a piece of glass that is still there, causing terrible pain. *Id*. at 14:10-18.  The infection sometimes causes her to miss school, and she is afraid that she will get another infection.  *Id*. at 24:7 – 25:1.

13

She also has a glass shard in her leg and foot, which hurt a lot and came out on its own. *Id*. at 16:7-14. She also has pain in her ear and she does not hear so well. *Id*. at 17:19-24. She cannot have the shard removed from her leg because it is too close to a nerve. *Id*. at 19:5-11. Additionally, she has scars from the bombing on her back and on her leg. *Id*. at 19:12-15.

Following the bombing, Orly had trouble sleeping at night, was afraid of terrorists, and was sometimes afraid to get up. *Id*. at 21:6-11. She has had these fears from the time of the bombing until present. *Id*. at 21:14-17. It is sometimes difficult for her to fall asleep, and she has to sleep with the light on because she is afraid to sleep in the dark. *Id*. at 21:24 – 22:3. Additionally, when she takes the bus to the Western Wall, she is afraid that terrorist will get on the bus and blow it up. *Id*. at 22:4-19. Currently, terrorist attacks remind her of the bombing on August 19, 2003; when she has these memories, she has trouble in school and cannot concentrate at home. *Id*. at 23:6-20. Even to present day, she has these fears, causing her to get scared at night and causing her to be too scared to get out of bed. *Id*. at 25:5-8. Additionally, she feels alone when her mother takes Shira to the doctors and leaves her alone. *Id*. at 25:22 – 26:2. Shira must still see doctors and get tests due to her injuries. *Id*. at 26:3-10. It was very hard for Orly to grow up with her parents and siblings all being injured; it was very difficult at times, as Ora was so preoccupied by Shira and her treatments. *Id*. at 26:11-24.

The entire family had a hard time due to their injuries caused by the attack. *Id*. at 27:12. It is hard for Orly to look at her father because his face was injured by the blast. *Id*. at 27:17 – 28:1. Everywhere she goes, people ask her about Shira's injuries; it is very hard for her. *Id*. at 28:2-8. As a result of the attack, Orly's entire home fell apart; her mother, Ora, has to go to treatments with Shira often, and her father, Shalom, has shards of glass in his face. *Id*. at 29:4

**6. Shira Cohen**: Shira Cohen, born January 8, 2002, was one year old at the time of the August

19, 2003 attack on the Number 2 bus. Her mother, Ora Cohen, has told her that her family was coming back from the Western Wall when a terrorist boarded the bus and detonated a bomb. *Id*. at 8:13-18. Shira must undergo many treatments and tests because of the attack. *Id*. at 9:2-16. She has to go to doctors constantly; she has to go to a doctor for eye drops if her eye is dry, another doctor is ready to operate on her left eye (3 doctors in total for her eyes). *Id*. at 9:24 – 12:3. She has to have eye drops about five times per day, one of which hurts and causes a burning sensation. Id. at 12:12 – 13:6. She sometimes gets a burning or itching sensation in her eyes. Id. at 13:10-13. Her and her family are consulting a doctor about getting scars down around her eyes. *Id*. at 12:6-11. She has to go to the hospital "pretty often" in order to see doctors and specialists for her injuries. *Id*. at 20:7-13. She has had to miss school because of her treatments. *Id*. at 23:14-20.

Shira had numerous injuries on her face. Her eyelid was injured; she has a piece of glass in her upper lip that curled her lip upward; she has shrapnel pieces under her chin. *Id*. at 14:9 – 15:2. People on the streets look at Shira and stop walking and ask her questions about what happened because she does not "have a regular eye and that [she has] scars" which is very difficult for her to talk about *Id*. at 16:15 – 17:5. It is very hard for Shira to look into the mirror because "people want beauty, and I know I don't have." *Id*. at 18:1-3. It is very hard for her if she has to go to a new place because she is always worrying about how people are going to react. *Id*. at 27:14-19.

Additionally, Shira often dreams of terrorists; she used to wake up and cry as well and sometimes trembles and has a hard time falling asleep. *Id*. at 18:18-23. She currently wakes up at night with fears of terrorist and is more scared of terrorist attacks, especially if someone fat gets on the bus, which causes her to become very scared. *Id*. at 19:2-21. When she hears about a

15

terrorist bombing, she feels really scary and sorry for the people involved.  *Id*. at 24:12-15.

**7. Elchanan Cohen**: Elchanan Cohen, born July 16, 2003, was one (1) month old at the time of the terrorist attack on August 19, 2003.  *See*, Deposition of Elchanan Cohen 2/17/16 at 6:12-13. Elchanan was told about the attacks by his parents; based on their accounts, he believes that he fell out of his mother's arms due to the blast and he fell under the terrorist's body; about an hour and a half after the attack, paramedics moved the terrorist's body and found him.  *Id*. at 7:17 – 8:13.  Elchanan believes that he broke his pelvis and hip in the attack.  *Id*. at 9:2-3.  He was told that he was then taken to the hospital and treated.  *Id*. at 9:4-6.

Growing up, Elchanan was told that his father was injured, Meirav's ears were injured, that Daniel was injured, that Orly has a lot of pain, and that Shira's eye was injured and that her doctors wanted to take out her eye; Shira has to put on creams and needs eye drops, and she has a burning sensation.  *Id*. at 9:7 – 11:17.  Elchanan knows this from talking to his family and from his family talking about it to other people.  *Id*. at 11:18-24.

Growing up has been hard for Elchanan; his mother, Ora, must take his sister, Shira, for eye treatments in Haifa, which is outside of town, which has been difficult for her and Elchanan. *Id*. at 12:9 – 13:8.  This forces her to leave Elchanan home alone, which is hard on him; he is very afraid/worried when he is left alone and afraid.  *Id*. at 13:17 – 15-3.  He has bad dreams at night of Arabs, which sometimes cause him to wake up in a cold sweat or in a tremble.  *Id*. at 15:5-13.  When Elchanan hears of other terrorist attacks, he feels like it is a miracle that he was saved, and it scares him to think of what might have happened.  *Id*. at 16:5-8.  He is now too afraid to go on buses to the Western Wall alone; he always goes with his mother, Ora.  *Id*. at 17:11.

16

**E. Plaintiffs Shokat Sadian, Ronit Mohaber, Individually And On Behalf Of The Estate Of Neria Mohaber, And Orly Mohaber Each Suffered Severe Emotional Distress As A Result Of The August 19, 2003 Terrorist Attacks.**

Shokat Sadian, Ronit Mohaber, Individually and on behalf of Neria Mohaber, and Orly Mohaber each suffered severe emotional distress as a result of the August 19, 2003 terrorist attacks and are entitled to solatium damages for their injuries.

1. Shokat Sadian is Ora Cohen's mother and is the grandmother to Meirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, and Elchanan Cohen.  Plaintiffs' counsel is working diligently to depose this plaintiff on or about March 28th or 29th, 2016.

2. Ronit Mohaber is Ora Cohen's sister, and files this case individually and on behalf of the Estate of Neria Mohaber.  Neria Mohaber was Ora Cohen's father.  Plaintiffs' counsel is working diligently to depose this plaintiff on or about March 28th or 29th, 2016.

3. Orly Mohaber is Ora Cohen's sister.  Plaintiffs' counsel is working diligently to depose this plaintiff on or about March 28th or 29th, 2016.

4. Joseph Mohaber is Ora Cohen's younger brother.  Because Mr. Mohaber was not a United States citizen at the time of the attack, Joseph Mohaber anticipates dismissing his claim in the near future.

## STANDARD OF REVIEW FOR ENTRY OF DEFAULT JUDGMENT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); 28 U.S.C. 1608(e).  The standard for evaluating claims under the FSIA and § 1608 is identical to the standard for entry of default judgment against the United States in Fed. R. Civ. P. 55(d). *Hall v. Republic of Iraq*, 328 F. 3d 680, 683-84

17

(D.C. Cir. 2003). "When the Defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Kim v. Democratic People's Republic of Korean*, 774 F. 3d 1044, 1047 (D.C. Cir. 2014).

In evaluating plaintiffs' proof, the Court should "accept as true the plaintiffs' uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000). "This Court accepts the uncontested evidence and testimony submitted by plaintiffs as true in light of the fact that the defendants in this action have not objected to it or even appeared in this action to contest it." *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007). In default judgment cases, plaintiffs may present evidence in the form of affidavits. *Moradi*, 77 F. Supp. 3d at 65; *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012*); Kim v. Democratic People's Republic of Korea*, 774 F. 3d at 1050 (relying on affidavits of plaintiffs experts in finding that evidence was satisfactory to the court). Further, courts may take judicial notice of evidence presented in earlier litigation without necessitating the formality of having that evidence reproduced. *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 116 (D.D.C. 2012).

## III.    THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER THE IRANIAN DEFENDANTS

Courts may exercise personal jurisdiction over a foreign state where the defendant is properly served in accordance with 28 U.S.C. § 1608. *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 148 (D.D.C. 2011). The FSIA establishes the requirements for proper service upon a foreign state or a political subdivision. Fed. R. Civ. P. 4(j)(1). The FSIA prescribes four methods of service:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The first two methods of service were not possible in this case as plaintiffs have no "special arrangement" for service with Iran and Iran is not a party to an "international convention on service of judicial documents."

Plaintiffs attempt to serve the Iranian Defendants through 28 U.S.C. § 1608(a)(3), was unsuccessful; the Summons was returned unexecuted as to the Republic of Iran. ECF. No. 11, 12, and 13. Accordingly, on October 28, 2013, Plaintiffs mailed two copies of the summons, complaint and notice of suit along with translations of each to the United States Department of State (to the attention of the Director of Special Consular Services) for service through diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4). ECF No. 14.

The United States Department of State confirmed on June 16, 2014 that Defendants, the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Iranian

Revolutionary Guard Corps were served with the pleadings on June 13, 2014. ECF No. 21.

Additionally, the Iranian Defendants were served with a diplomatic note of transmittal that

specifically stated:

> [U]nder U.S. law any jurisdictional or other defense including claims of sovereign
> immunity must be addressed to the court before which the matter is pending, for
> which reason it is advisable to consult an attorney in the United States. Otherwise
> proceedings will continue without an opportunity to present arguments or
> evidence.

22 C.F.R. 93.1(d); ECF No. 21 at 8.

In the case of service under 1608(a)(4) "service shall be deemed to have been made…as

of the date of *transmittal* indicated in the certified copy of the diplomatic note." 28 U.S.C.

1608(c)(1)(emphasis added). Therefore, service was proper under 1608(a)(4) despite the return

of documents" by the Iranian Ministry of Foreign Affairs. *Ben-Rafael v. Islamic Republic of Iran*,

540 F. Supp. 2d 39, 52 (D.D.C. 2008); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 64

(D.D.C. 2015) (finding that service was proper despite the fact that the Iranian Ministry of

Foreign Affairs refused the documents being served pursuant to 28 U.S.C. 1608(a)(4)); *Belkin v.

Islamic Republic of Iran*, 667 F. Supp. 2d 8, 11 (D.D.C. 2009)(same); *Kapar v. Islamic Republic

of Iran*, 105 F. Supp. 3d 99, 108 n. 2 (D.D.C. 2015)(same).

On March 24, 2015, Plaintiffs filed an Affidavit for Default Judgment as to the Iranian

Defendants. ECF No.  22.  On March 24, 2015, the Clerk of Court entered default against the

Iranian Defendants. ECF No. 23. Plaintiffs now seek entry of judgment on the Iranian

Defendants' default.

## IV.    THE COURT MAY ASSERT SUBJECT MATTER JURISDICTION OVER THIS CASE

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the

exclusive basis for subject matter jurisdiction over civil actions against foreign state defendants.

20

28 U.S.C. §§ 1330, 1602-1611. A federal district court may obtain jurisdiction over a foreign sovereign where one of the FSIA's enumerated exceptions applies.

The Defense Authorization Act for Fiscal Year 2008, ("Defense Authorization Act"), Section 1083, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) revised the framework under which state-sponsored terrorism cases are brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7). Significantly, 1605A created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for acts committed by the State and its agents. Despite the significant changes in the law, however, the requirements for the Court to assert its subject matter jurisdiction over this case have not changed. *See* 28 U.S.C § 1605A(a)(1), (a)(2).

The requirements for subject matter jurisdiction under 28 U.S.C. § 1605A allow Plaintiffs to seek money damages for personal injury or death if the damages were caused by:

1. the providing of "material support or resources"[3] for an act of hostage taking, torture, or an extrajudicial killing;

2. engaged in by an official while acting within the scope of his office;

3. the defendant was a "state-sponsor of terrorism" at the time the act complained of occurred; and

4. the claimant or the victim was a "national of the United States."[4]

---

[3] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18." 18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

[4] Subject matter jurisdiction is also appropriate in cases where the claimant or the victim was a "member of the armed forces" or "otherwise an employee of the Government of the United States, or an individual performing a contract awarded by the United States Government." 28 U.S.C. § 1605A(a)(2).

28 U.S.C. § 1605A(a)(1), (a)(2).  As set forth below, Plaintiffs satisfy each of the requirements for subject matter jurisdiction. First, Defendants were designated as state sponsors of terrorism at the time of the August 19, 2003 terrorist attack. Second, Plaintiffs' injuries were caused by acts of "extrajudicial killing" and the provision of "material support" to Hamas. Third, Plaintiffs were all United States nationals at the time of the attack.

### A. Plaintiffs Injuries Were Caused By Acts of Extrajudicial Killings and Defendants' Provision of Material Support To Hamas.

Immunity under the FSIA is not appropriate where "money damages are sought against a foreign state for personal injury or death that was caused by an act of extrajudicial killing…or the provision of material support or resources for such an act if such an act or provision of material support or resources is engaged in by an official, employee or agent or such foreign state while acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605A(a)(1).[5]

Plaintiffs' proved beyond their burden under 28 U.S.C. § 1608(e) that the Iranian Defendants provided material support and resources to Hamas for acts of terrorism, including extrajudicial killings. With the support of the Iranian Defendants, Hamas killed twenty-three innocent civilians (7 children; 16 adults) – and attempted to kill hundreds more – and wounded over 130 more in the August 19, 2003 terrorist attack. It is undisputed that the August 19, 2003 terrorist attack "was planned by members of Hamas and there has been no evidence that the attack was sanctioned by any judicial body – legitimate or otherwise." *Beer v. Islamic Republic of Iran*, 2010 WL 5105174 (D.D.C. 2010).  Such acts of terrorism are contrary to the guarantees

---

[5] Extrajudicial killing means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensible by civilized peoples. 28 U.S.C. § 1605A(h)(7); 28 U.S.C.  § 1350.

"recognized as indispensable by civilized persons." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 150 (D.D.C. 2011). Thus, the August 19, 2003 terrorist attack constitutes an "extrajudicial killing." *Id.*; *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 101 (D.D.C. 2012) (Hamas suicide bombing constitutes an extrajudicial killing).

The Court "has determined that 'the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes providing material support and resources for a terrorist act within the meaning'" of the FSIA state-sponsored terrorism exception. *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 182-83 (D.D.C. 2010); *In re Terrorism Litig.,* 659 F.Supp.2d 31, 42 (D.D.C. 2009). "Thus, where a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the statute." *Id.*

There is no "but-for causation requirement under the FSIA; proximate causation is sufficient." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 75 (D.D.C. 2010). Proximate cause may be established by a showing of a "reasonable connection" between the material support provided and the ultimate act of terrorism. *Owens*, 826 F. Supp. 2d at 151. Here, the expert testimony of Dr. Clawson and Dr. Levitt establish that the Iranian Defendants routinely provided financial assistance to Hamas and other terrorist groups. The evidence proves that defendants: (1) provided substantial support to Hamas through provision of money and training; and (2) encouraged the escalation of terrorist activities against Israeli targets. *See*, *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 394 (D.D.C. 2015) (finding that these same acts "have a reasonable connection to an attack carried out by Hamas in 2001). "This is sufficient for the relatively low proximate cause bar imposed by the FSIA." *Id.* at 394.

23

Under such circumstances, the Iranian Defendants may be held liable for the acts of Hamas under the state-sponsored terrorism exception and the imposition of vicarious liability under 28 U.S.C. §1605A(c).

**B. Defendants Were Designated As State Sponsors of Terrorism at the Time This Action Was Filed.**

Plaintiffs comply with 28 U.S.C. § 1605A(a)(2)(A)(i)(II) as each of the Defendants were designated state sponsors of terrorism at the time of filing. The term "state-sponsor of terrorism" is defined by statute at 28 U.S.C. § 1605A(h)(6):

> the term 'state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism . . . .

Iran was formally designated a "state sponsor of terrorism" on January 19, 1984 in accordance with section 6(j) of the Export Administration Act of 1979 50 U.S.C. App. 2405(j), *see also* 49 Fed. Reg. 2836-02 (statement of Secretary of State George P. Schultz), and continues to this day to be designated as a state sponsor of terrorism.

Once a country has been designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President submits to Congress a proper report, as described in the Export Administration Act ("EAA"). 50 App. U.S.C. § 2405(j)(4). Iran has ever been taken off of the list of state sponsors of terrorism, pursuant to the EAA. As the terrorist attack in this case occurred on August 19, 2003, the requirements set forth in 28 U.S.C. § 1605A(a)(2)(A)(i)(II) are satisfied.

**C. Plaintiffs' Claims, Aside From Joseph Mohaber, Meet the Requirements of 28 U.S.C. § 1605A(a)(2)(A)(ii) as Plaintiffs Were Citizens of the United States at the Time of the Attack.**

In order to assert subject matter jurisdiction under 1605A either the victim or claimant must be a U.S. national, a member of the armed forces, or "an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government" at the time of the act of terrorism.  28 U.S.C. § 1605A(a)(2)(A)(ii).  The term "national of the United States" is defined by 8 U.S.C. § 1101(a)(22) and includes (1) "a citizen of the United States" and (2) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.[6]

Plaintiffs, aside from Joseph Mohaber, are United States citizens and were citizens at the time of the August 19, 2003 terrorist attack[7]. A valid United States passport and "Certificate of Birth Abroad" issued by the Secretary of State shall constitute conclusive proof of United States citizenship. 22 U.S.C. § 2705; *See*, *also*,  22 U.S.C. 212 ("No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States."). At no time did Plaintiffs ever intend to relinquish their United States citizenship. *See Parness v. Shultz*, 669 F. Supp. 7 (D.D.C. 1987).

## V.     DEFENDANTS ARE LIABLE FOR PLAINTIFFS' INJURIES

Plaintiffs' claims are brought under section 1605A(c). This newly created federal cause of action authorizes claims against state sponsors of terrorism to recover compensatory and punitive damages for personal injury or death caused by the foreign state.   "Once jurisdiction has been established over plaintiffs' claims against all defendants, liability on those claims in a default judgment case is established by the same evidence if 'satisfactory to the Court.'" *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011); 28 U.S.C. § 1608(e).

"To obtain damages in an FSIA action, the plaintiff must prove that the consequences of

---

[6] See 1605A(h)(5)("the term 'national of the United States' has the meaning given that term in section  101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).
[7] Plaintiffs anticipate filing Plaintiffs' passports with an updated Exhibit List shortly.

the defendants' conduct were reasonably certain (i.e. more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this Circuit's application of the American rule on damages." *Valore*, 700 F. Supp. 2d at 83; *quoting Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16  (D.D.C. 2005). As demonstrated above, the evidence proves that the commission of acts of extrajudicial killing and Defendants' provision of material support and resources for such killing was reasonably certain to cause injury to plaintiffs. Therefore, the court must consider what constitutes "reasonable" economic, pain-and-suffering, and solatium damages." *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 257 (D.D.C. 2014).

"This Court and others have frequently addressed the Intentional Infliction of Emotional Distress ("IIED") theory following the enactment of § 1605A." *Goldberg-Botvin v. Islamic Republic of Iran,* 938 F. Supp. 2d 1, 9 (D.D.C. 2013); *Fain v. Islamic Republic of Iran,* 856 F.Supp.2d 109, 123 (D.D.C.2012). Relying principally on the Restatement, courts have set forth the following standard: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran,* 659 F.Supp.2d 20, 26 (D.D.C.2009) (citing Restatement (Second) of Torts § 46(1)). "Survivors are entitled to recover for the pain and suffering caused by the bombings: acts of terrorism 'by their very definition' amount to extreme and outrageous conduct and are thus compensable by analogy under the tort of "intentional infliction of emotional distress.'" *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 89 (D.D.C. 2014); *Valore,* 700 F.Supp.2d at 77 (citing Restatement (Second) of Torts § 46(1) (1965)); *see also Baker v. Socialist People's Libyan Arab Jamahirya,* 775 F.Supp.2d 48, 74 (D.D.C.2011) (permitting plaintiffs injured in state-sponsored

26

terrorist bombings to recover for personal injuries, including pain and suffering, under tort of

"intentional infliction of emotional distress"); *Estate of Bland v. Islamic Republic of Iran,* 831

F.Supp.2d 150, 153 (D.D.C.2011) (same).

Damages under 1605A(c) "may include economic damages, solatium, pain and suffering,

and punitive damages." 28 U.S.C. § 1605(c)(4). "Accordingly, those who survived the attack can

recover damages for their pain and suffering, as well as any other economic losses caused by

their injuries;…family members can recover solatium for their emotional injury; and all plaintiffs

can recover punitive damages." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83

(D.D.C. 2010).

### A.  Plaintiffs Ora Cohen, Meirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, and Elchanan Cohen Are Each Entitled To Damages For Pain and Suffering As Surviving Victims Of The August 19, 2003 Terrorist Attack.

In awarding damages to surviving victims of terrorist attacks, "courts typically award a

lump sum, and in so doing, articulate several factors as relevant: the severity of the pain

immediately following the injury, the length of hospitalization, and the extent of the impairment

that will remain with the victim for the rest of his or her life." *Brewer v. Islamic Republic of Iran*,

664 F. Supp. 2d 43, 55 (D.D.C. 2009); *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44,

46 (D.D.C. 2012). Courts in this District have developed a framework granting a baseline award

of $5 million to surviving victims suffering physical injuries such as fractures, severe flesh

wounds and wounds and scars from shrapnel and "lasting and severe psychological pain." *Valore*

*v. Islamic Republic of Iran*, 700 F. Supp. 2d at 84.

Courts    have    also    been    willing    to    depart    upward    from    the    baseline    in

"more severe instances of physical and psychological pain." *Id*. at 84.[8]  In *Mousa v. Islamic*

---

[8] "This Court readily acknowledges that it is 'undeniably difficult' to assess the amount of

*Republic of Iran*, 238 F. Supp. 2d 1, 5 (D.D.C. 2001), the plaintiff was awarded $12 million in pain and suffering where she sustained permanent injuries including hearing loss, disfigurement, scarring, concentration problems, walking difficulties and PTSD following a suicide bombing in Israel. *Id*. In *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003), the plaintiff, Jenny Rubin ("Ms. Rubin") was awarded $7 million in compensatory damages for injuries she sustained in a bombing at a pedestrian mall in Israel. *Id*. at 261. Although Ms. Rubin initially exhibited "no obvious physical injuries" the evidence demonstrated that she continues to suffer from a constant ringing or buzzing sound, difficulty concentrating, fear, emotional reactions to other terrorist attacks and paranoia. *Id*. Likewise, in *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43 (2009), the Court awarded the plaintiff $7 million where he suffered physical injuries and continues to suffer from depression, anxiety, alcoholism and "the attack continues to hamper his ability to enjoy life's daily pleasures." *Id*. at 57.

Each of the Cohen family members that survived the terrorist attack on August 19, 2003 – Ora Cohen, Shalom Cohen, Meirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, and Elchanan Cohen – each suffered severe physical and emotional damage that lasts to this day as detailed above and in their respective deposition transcripts. These damages permit an upward departure from the baseline amount awarded to victims of terrorist attacks. Plaintiffs, aside from Shalom Cohen, who is seeking solatium damages because he is not a U.S. citizen (*see* below section on solatium damages), are entitled to pain-and-suffering damages in the amount of $7

---

compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved. Each victim's suffering is unique, and, therefore, comparing the severity of the mental anguish endured by one victim to another is undoubtedly an inexact science. *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009) (internal quotation omitted).

million.

**B. Ora Cohen's Family Members – Plaintiffs Shalom Cohen, Shokat Sadian, Ronit Mohaber, Individually And On Behalf Of The Estate Of Neria Mohaber, And Orly Mohaber – Are Entitled Damages For Solatium**

Solatium, a form of compensatory damages, seeks "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort."[9] *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 2d 286, 290 (D.D.C. 2015); *Roth,* 78 F.Supp.3d 379, 402, 2015 WL 349208 at *15. Only immediate family members – parents, siblings, spouses, and children – are entitled to solatium awards. *Owens*, 71 F. Supp. 3d at 260. "Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish[,] ... and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages" for siblings. *Id.*

In terrorism actions brought pursuant to section 1605A of the FSIA, family members are not required to establish that they were present at the time of the incident in order to recover solatium damages. *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 80 (D.D.C. 2010) ("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result."). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8, 22 (D.D.C.2009) (citing *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89

---

[9] Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED. *Spencer v. Islamic Republic of Iran,* No. 12–CIV–42, 71 F.Supp.3d 23, 26–27, 2014 WL 5141429, at *2 (D.D.C. Oct. 14, 2014) (citing *Valore,* 700 F.Supp.2d at 85).

(D.D.C.2002)).

For the pain and suffering of relatives who were not present at the site of the attack, damages "must be determined by the nature of the relationship and the severity and duration of the pain suffered by the family member." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d, at 55. The standard award to parents of survivors of terrorist attacks is $2.5 million in pain and suffering damages. *Id. Owens v. Republic of Sudan,* 71 F. Supp. 3d at 260; *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 52 (D.D.C.2007). The standard award to siblings of survivors is $1.25 million. *Owens*, 71 F. Supp. 3d at 260 (finding that while "these amounts are guidelines, not rules, the Court finds the distinctions in *Peterson* and other cases to be reasonable, and thus will adopt this framework for determining solatium damages here."). Just today, a Court in this District again explained that "terrorist attacks are a form of outrageous conduct to which the presence requirement should not apply." *Owens et al. v. Republic of Sudan*, No. 01-2244 (D.D.C. 3/23/16 Doc. 305 at p.68).

Plaintiffs request that the Court adopt the framework for determining solatium damages in this case and award the following damages upon sufficient proof anticipated in the shortly anticipated depositions of Ora Cohen's family members:

| Plaintiff | Relationship to Ora Cohen | Solatium Damages |
|---|---|---|
| Shalom Cohen[10] | Husband at the time of the attack; survivor and victim of the terrorist bombing | $2.5 million + |
| Shokat Sadian | Mother | $2.5 million |
| Estate of Neria Mohaber | Father | $2.5 million |
| Ronit Mohaber | Sister | $1.25 million |

---

[10] Since Shalom Cohen is not a US citizen, he is seeking solatium damages in this case. However, due to his extremely close proximity to Ora Cohen as her then-husband and survivor of the bombing, his solatium damages merit an upward departure from the 2.5 million standard for solatium damages, according to proof.

| Orly Mohaber | Sister | $1.25 million |
|---|---|---|

### C.  Plaintiffs Are Entitled to Prejudgment Interest

Plaintiffs are each entitled to prejudgment interest on awards for pain and suffering and solatium. *Owens*, 71 F. Supp. 3d at 261. "Denying prejudgment interest on these damages would allow defendants to profit from their use of these funds" over the intervening thirteen years. *Id*. at 261 (awarding prejudgment interest on plaintiffs' pain-and-suffering and solatium awards in order to "place plaintiffs in the same position they would have been had they received (and invested) their damages awards at the time of the attack).

An award of prejudgment interest should be calculated "at the prime rate for each year between the accident and the entry of judgment." *Id*. at 262; *Forman v. Korea Air Lines Co*., 84 F. 3d 446, 450-51 (D.C. Cir. 1996).[11]  "Calculating interest based on the prime rate for each year is a simple matter." *Id*. at 262.

The Federal Reserve's data for the average annual prime rate in each year between 2002 and 2015 include:

| | |
|---|---|
| 2003 | 4.12 |
| 2004 | 4.34 |
| 2005 | 6.19 |
| 2006 | 7.96 |
| 2007 | 8.05 |
| 2008 | 5.09 |
| 2009 | 3.25 |
| 2010 | 3.25 |
| 2011 | 3.25 |

---

[11] The prime rate is "the rate banks charge for short-term unsecured loans to creditworthy customers." *Owens*, 71 F. Supp. at 262; *citing Forman v. Korea Air Lines Co*., 84 F. 3d 446, 450-51 (D.C. Cir. 1996).

| 2012 | 3.25 |
|------|------|
| 2013 | 3.25 |
| 2014 | 3.25 |
| 2015 | 3.26 |

*See*, Bd of Governors of the Fed. Reserve Sys. Historical Data, available at http://www.federalreserve.gov/releases/h15/data.htm. In using the framework established by this Court in *Owens*, the prime rate for each year results in a multiplier 1.77 for damages incurred in 2002.

### D.  Plaintiffs Are Entitled to Punitive Damages

"Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Bodoff v. Islamic Republic of Iran*, 907 F.Supp.2d 93, 105 (D.D.C.2012); *quoting Oveissi v. Islamic Republic of Iran*, 879 F.Supp.2d 44, 56 (D.D.C.2012)). The determination as to the proper amount of punitive damages to award to a plaintiff is based on four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290-91 (D.D.C. 2015).

Courts in this District have consistently awarded punitive damages against the Iranian Defendants for providing material support and resources to Hamas. In awarding punitive damages, this Court has found that "defendants' material support for Hamas' terrorist activities is truly awful and worthy of gravest condemnation." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 406 (D.D.C. 2015). The harm caused by defendants' is among the worst imaginable – a terrorist attack aimed at students that shattered the lives of the entire Bluth family.  As one

member of the Bluth family testified:

> That's not something that you expect when you send somebody, you send off your brother, your child to study in a yeshiva environment. It's not as if you send him off to war, or you send him to the army, where you actually expect something bad to happen. Also the actual way that this – that the terrorist targeted young children in their dormitory and tried to hunt down in their dormitory was especially horrific.

(Exhibit 46; Joseph Dep. at 22:21-23:4).

As Dr. Clawson notes in his Affidavit, "Iran has not decreased its support for terrorism, but has dramatically increased and widened its support for terrorists, terrorist organizations and terrorist activities throughout the world." (Clawson Affidavit at 13). Further, an award of punitive damages "would be read by Iranian officials as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans." *Id*. at 14.

The proper level of punitive damages is "based on a multiplied estimate of Iran's annual expenditures in support of terrorist activities." *Id*. at 406. Dr. Clawson, "has testified in several cases on the amounts of punitive damages that would serve to deter Iran from supporting terrorist activities against nationals of the United States." *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012). Dr. Clawson declared that "the financial material support provided by Iran in support of terrorism is in the range of $300 million to $500 million a year." *Id*. at 105.

This Court has previously explained that the particularly malicious and evil nature of state-sponsored terrorism obviates the need for strict attention to the punitive-to-compensatory ratio that recent Supreme Court guidance might otherwise require. *Beer v. Islamic Republic of Iran,* 789 F. Supp. 2d 14, 25 (D.D.C. 2011). Accordingly, this Court frequently awards punitive damages against Iran in the amount of $300 million for providing material support to terrorist organizations, including Hamas. *Id*; *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012)(awarding $300 million in punitive damages); *Bodoff v. Islamic Republic of Iran*,

907 F. Supp. 2d 93 (D.D.C. 2012) (same).

Plaintiffs are entitled to an award of punitive damages in the amount of $300 million. The Court has never before awarded punitive damages in a case arising out of this incident and, therefore, there is no need to reduce the level of punitive damages in light of prior awards. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d at 406.

### E. This Court May Rely On Hearsay Materials Relied Upon By Dr. Clawson and Levitt Because These Experts Have Brought Their Expertise To Bear On "Hearsay Materials To Form The Types Of Sources Reasonably Relied On By Experts In The Field.

This Court may rely on "hearsay" materials relied upon by Drs. Clawson and Levitt because the Clawson Affidavit and the Levitt Declaration bring Dr. Clawson and Dr. Levitt's expertise to bear on the "hearsay" of news reports, academic materials, and secondary sources which do not simply regurgitate hearsay in the form of an expert opinion; rather, these reports bring Dr. Clawson and Dr. Levitt's expertise to bear on these sources to form the types of sources that are reasonably relied on by experts in the field.  Numerous courts have dealt with nearly this exact same issue involving similar affidavits from Dr. Levitt and have routinely relied on hearsay materials contained in Dr. Levitt's declarations, eventually determining that his declarations – which bring his expertise to bear on various hearsay materials - are admissible over hearsay objections:

> However, courts in this circuit have admitted testimony from experts based upon hearsay analyzing the "origin, leadership, and operational structure" of terrorist organizations, analogizing such testimony "to the type of expert testimony regularly permitted by the United States Court of Appeals for the Second Circuit in cases involving organized crime families." *United States v. Paracha,* 2006 WL 12768, at *21 (S.D.N.Y. Jan. 3, 2006) (citing *United States v. Amuso,* 21 F.3d 1251, 1263–64 (2d Cir.1994); *United States v. Locascio,* 6 F.3d 924, 936 (2d Cir.1993); *United States v. Daly,* 842 F.2d 1380, 1388 (2d Cir.1988)), *aff'd,* 313 Fed.Appx. 347 (2d Cir.2008). Indeed, courts, including this one, have allowed Levitt to testify about similar terrorist organizational matters over objections that his testimony only repeated inadmissible hearsay. *See United States v. Damrah,* 412 F.3d 618, 625 (6th Cir.2005) (Affirming district court's holding that Levitt's

reliance upon hearsay was permissible because, "[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon."); *United States v. Hammoud,* 381 F.3d 316, 336–38 (4th Cir.2004) (en banc) (Affirming admission of Levitt's testimony describing Hezbollah's structure and leadership.), *rev'd on other grounds,* 543 U.S. 1097, 125 S.Ct. 1051, 160 L.Ed.2d 997 (2005); *United States v. Defreitas,* 2011 WL 317964 (E.D.N.Y. Jan. 31, 2011) (Admitting Levitt's testimony about "background information on Hezbollah and that group's longstanding presence in South America and its efforts to secure financing, recruit operatives and conduct terrorist attacks." (quotation marks omitted)). Additionally, as stated above, in *Gill,* Judge Weinstein also held that similar testimony about Hamas' organizational structure from both Levitt and Spitzen were admissible, notwithstanding objections that their reports relied upon inadmissible evidence. *Gill II,* 893 F.Supp.2d at 533.

Here, while both Levitt and Spitzen rely in large part upon sources such as news reports and academic materials that are hearsay, and portions of their reports appear to be repetition of other secondary sources, their proposed testimony generally is admissible. Their reports do not only regurgitate the hearsay, but bring to bear their terrorism expertise, and the types of sources they use are reasonably relied upon by experts in the field. For example, rather than just cut and paste or summarize what others have said about Hamas, Levitt uses the information to opine that social welfare organizations affiliated with Hamas are crucial to its ability to carry out terrorist attacks. (*See* Levitt Supp. Report 2.) He uses his expertise to describe the leadership structures of Hamas and the 13 Charities, and thus how the 13 Charities are connected to Hamas. (*Id.* 2–3.) Moreover, as other courts have noted in the past, it is reasonable that an expert in terrorism would have to rely on hearsay as opposed to relying solely on fieldwork, as terrorist organizations necessarily are secretive and dangerous, and there may be political reasons against meeting with reputed terrorists. (*See* Goelman Decl. Ex. 125 at 111 (Levitt's testimony that, while he has met with Hamas members who are in jail, he does not meet with those who are not in jail because he does not want to create the impression, as a former government official, that he was opening up a back channel between the United States government and Hamas).)

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 438-39 (E.D.N.Y. 2013).  Similarly, here, the hearsay materials contained in the Levitt Declaration and Clawson Affidavit can be relied on by this Court because the Levitt Declaration and Clawson Affidavit do not simply regurgitate hearsay in the form of an expert opinion; rather, these reports bring Dr. Clawson and Dr. Levitt's expertise to bear on various "hearsay" materials (i.e. news reports and academic materials) to form the types of sources that are reasonably relied on by experts in the field.  Therefore, not only may this Court rely on the same hearsay materials relied upon by Drs. Clawson and Levitt,

the Clawson Affidavit and the Levitt Declaration are themselves admissible evidence that this

Court may rely on in adjudicating Plaintiffs' Motion for Default Judgment.

### F.  Plaintiffs Who Were Young Children At The Time Of The Attack May Recover For Intentional Infliction Of Emotional Distress (IIED)

This Court has determined that a defendant is liable for intentional infliction of emotional

distress, without any consideration for the age of the victim, where the victim did, in fact, suffer

severe emotional and physical injury.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51,

74 (D.D.C. 2010).  The requirement for an IIED claim is very straightforward and applicable

here, particularly in a case involving an act of terrorism:

> Finally, survivors have also alleged intentional infliction of emotional distress. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46(1). "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8 (D.D.C.2009) (citing *Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C.2002)). Accepting these plaintiffs' and intervenors' uncontroverted assertions that they did, in fact, suffer severe emotional and physical injury, Pls.' Compl. ¶¶ 26, 31, the Court concludes that defendants are liable for IIED.

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010).  Indeed, the three

elements of IIED are present here where, under District of Columbia law, IIED is defined as (1)

extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly

(3) causes the plaintiff severe emotional distress.  *Ben-Rafael v. Islamic Republic of Iran*, 540 F.

Supp. 2d 39, 56 (D.D.C. 2008).  First, a terrorist bombing is per se extreme and outrageous

conduct ("Acts of terrorism are by their very definition extreme and outrageous and intended to

cause the highest degree of emotional distress, literally, terror.").  *Id*.  Second, the bombing was

clearly intended to cause emotional distress. ("The intent or recklessness can be inferred from the

outrageousness of the acts.").  *Id*.

As described above and throughout their deposition testimony, the third element of IIED

is met here because each of the minor children in this case plainly experienced severe emotional and physical harm – as a result of being in close proximity to the terrorist bomb blast that propelled glass and shrapnel into their bodies - that lasts even to this day, more than a decade after the bombing on August 19, 2003. Each of the minor children in this case are therefore entitled to compensation for IIED.

## CONCLUSION

For the foregoing reasons, the Court finds that the Iranian Defendants are liable for the injuries to Ora Cohen, Shalom Cohen, Meirav Cohen, Daniel Cohen, Orly Cohen, Shira Cohen, and Elchanan Cohen and Ora Cohen's immediate family members. "Damages cannot fully compensate these innocent people, who have suffered so much. But they can offer a helping hand. That is the very least that plaintiffs are owed – and that is what this Court seeks to accomplish." *Owens*, 71 F. Supp. 3d at 262.  Accordingly, the Court grants plaintiffs' motion for default judgment and enters judgment for plaintiffs in the amounts specified above.

Respectfully submitted,

/s/ Michael J. Miller
Michael J. Miller, Esq.
D.C. Bar No. 397689
David J. Dickens, Esq.
*Admitted Pro Hac Vice*
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Tel: (540) 672-4224

Allen L. Rothenberg, Esq.
D.C. Bar No. 328088
1420 Walnut Street, 2nd Floor
Philadelphia, PA  19102
Tel: (800) 624-8888

*Attorneys for Plaintiffs*