## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **ORA COHEN, et al.** |
| Plaintiffs, |
| v. |
| **ISLAMIC REPUBLIC OF IRAN, <u>et al.</u>,** |
| Defendants. |

Case No. 12-cv-01496 (CRC)

### <u>MEMORANDUM OPINION</u>

Ora Cohen, her then-husband Shalom, and their five children were travelling home in Jerusalem when a Hamas operative boarded their bus and detonated a bomb strapped to his chest, killing 23 people and injuring many more, including every member of the Cohen family.  The Cohens, along with several members of Ora's family in the United States, bring this action against the Islamic Republic of Iran ("Iran") and two of its instrumentalities under the state-sponsor-of-terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(1)(a).  They allege that the Iranian defendants are liable for their injuries as a result of Iran's longstanding provision of material support for Hamas's terrorist activities.  Because Iran has chosen not to appear in this action, Plaintiffs have moved for a default judgment.  Finding that Plaintiffs have established both jurisdiction and liability under the FSIA, the Court will grant the default judgment and appoint a special master to prepare a report and recommendation on the imposition of damages.

### I.    Background

The facts summarized below are derived from the Complaint; Plaintiffs' Motion for Default Judgment, along with its supporting exhibits; and live testimony taken during an evidentiary hearing held by the Court on February 22, 2016.

A.      Terrorist Attack in Jerusalem on August 19, 2003

On August 19, 2003, Ora Cohen and her then-husband Shalom journeyed to the Western

Wall, a holy site in Old Jerusalem, for an afternoon of prayer.  Evid. Tr. 17:4–9.  Their five

children—daughter Meirav Cohen (7 years old at the time); son Daniel Cohen (6 years old);

daughter Orly Cohen (4 years old); daughter Shira Cohen (1 year old); and newborn son,

Elchanan Cohen (1 month old)—accompanied them on this family outing.  Pls.' Mem. Supp.

Mot. Default J. ("Pls.' MDJ") 1.  That evening, the Cohen family boarded the Number 2 Egged

Bus to return home.  Id.  Because the bus was crowded, the family was forced to split up in order

to find seating, with Shalom and Shira standing in the middle of the bus apart from the rest of the

family, who were seated near the front.  Compl. ¶ 66.  A few stops short of their final destination,

Ora observed a gentleman force his way onto the bus and remembers the "whole world [going]

black."  Evid. Tr. 17:21–19:18.

Hamas operative Raed Misk had boarded the bus in the Shmuel Ha-Navi neighborhood

with a bomb strapped to his body.  Pls.' MDJ 1.  He detonated it almost immediately upon

boarding, killing 23 people and injuring 130 more, including every Cohen family member

aboard.  Id.  Ora had been nursing her infant son at the time of the bombing and recalls how the

force of the explosion tore him from her hands.  Evid. Tr. 19:23–20:8.  Amidst the chaos that

ensued, the family members were separated and taken to different hospitals for treatment.  The

three older Cohen children were taken to the same hospital as their parents, but Ora did not learn

that her younger children had survived until several hours after the attack, and the family was not

reunited for at least a week.  Pls.' MDJ 1.  Each of the Cohens was physically injured in the

original blast and, to varying degrees, continues to experience the effects of the bombing today.

Their alleged injuries include loss of vision, loss of hearing, damage from shrapnel, anxiety

attacks, depression, fear of public transportation, and ongoing emotional trauma.  See Pls.' MDJ 6–16.

Within hours of the attack, Hamas claimed responsibility for the suicide bombing by releasing a series of photographs of Misk on its website, some of him posing with automatic weapons; posting a video of him reading his living will; and adding him to its list of Hamas "martyrs."  See Pls.' MDJ, Ex. 4 ("Levitt Decl.") at 19–20; see also Pls.' MDJ, Exs. 11–15 (translations of Hamas' website featuring photos and statements from Misk).  A number of Hamas operatives, who helped plan and execute the bus bombing, were eventually captured and convicted for their role in the conspiracy.  Id.; see also Pls.' MDJ, Exs. 16–20 (sentences and verdicts for four of Misk's co-conspirators).

Soon after the bombing, Ronit Mohabber, Ora's sister who was living in California, learned that Ora and her family had been victims of the attack.  See Pls.' MDJ, Ex. 27 ("Ronit Dep.") at 10:9–11:15.  She broke the news to their younger sister, Orly Mohaber, later that day.[1] See id. at 13:12–14:24.  The sisters decided to keep the information from their mother and father, Shokat Sadian and Neria Mohaber, because they worried about how their parents would be affected by the news:  Shokat was wheelchair-bound and recovering from a stroke, and Neria had recently undergone a triple bypass surgery.  See id. at 12:4–12.  Over the next few months, however, Ms. Sadian noticed her daughters acting suspiciously and eventually learned that Ora and her grandchildren had been victims of the bus bombing.  Pls.' MDJ, Ex. 30 ("Shokat Aff.") ¶¶ 4–6.  She immediately told her husband, who was visibly shaken.  Id. at ¶ 7.  He would ask

---

[1] The Mohabers use different English transliterations of their last name, which accounts for the difference in spellings between siblings.  The Court will use the Mohaber version of the last name to refer to Ora's family living in the United States, and to avoid confusion will use first names when referring to individual parties.

how Ora and her children were doing every day and wanted to see for himself that they had

survived, but he did not have the opportunity to see them in person before he passed away in

2009.  Id. at ¶ 9.

B.    Plaintiffs

Ora Cohen was born in Iran, but immigrated with her parents and siblings to the United

States.  Evid. Tr. 13:22–14:9.  Ora, along with her parents and sisters, acquired U.S. citizenship

through naturalization.  See id. at 14:16–15:1.  When visiting Israel, she met and married Shalom

Cohen, a foreign national, and the couple decided to settle there.  See id. at 14:10–13.  All of

their children, except Meirav, who was born in Los Angeles, were born in Israel but acquired

U.S. citizenship upon birth through their mother.  Pls.' MDJ, Ex. 29 ("Ora Aff.") ¶¶ 2, 4–11.

C.    Defendants' Support of Hamas

The facts contained in this section largely derive from the declarations of two experts

with extensive experience studying, writing, and testifying about Iran:  Dr. Patrick Clawson, the

Director for Research at The Washington Institute for Near East Policy, and Dr. Matthew Levitt,

a Senior Fellow and Director at The Washington Institute for Near East Policy.  Pls.' MDJ, Ex. 2

("Clawson Aff."); Ex. 4 ("Levitt Decl.").[2]  Hamas, short for Harakat al-Muqawamah al-

Islamiyya or "the Islamic Resistance Movement," operates out of the West Bank and Gaza Strip.

Compl. ¶ 27.  According to Dr. Levitt, Hamas has as its mission the "destr[uction of] Israel and

---

[2] Dr. Clawson has been studying the Middle East for over 35 years.  Clawson Aff at 1.
Dr. Levitt holds a Ph.D. in International Relations from The Fletcher School of Law and
Diplomacy at Tufts University, and has been studying the region for roughly 20 years.  Levitt
Decl. at 1.  Both have been qualified as experts multiple times by courts in the district when
considering motions for default judgment against a sovereign.  See, e.g., Bluth v. Islamic
Republic of Iran, 2016 WL 4491760, nn. 1–2 (D.D.C.  Aug. 25, 2016) (qualifying both as
experts); Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52 (2010) (relying on testimony
from Dr. Clawson).  The Court will likewise rely on their submissions for that purpose.

creat[ion of] an Islamic Palestinian state in its place," and will use any means necessary to achieve its goal.  Levitt Decl. at 17.  As part of its resistance efforts, Hamas carries out attacks "intended to terrorize, to instill fear in the civilians who compromise the local population so that they will . . . leave."  Id. at 18.  In 1995, the United States government labeled Hamas a "Specially Designated Terrorist," and in 1997, it was designated a "Foreign Terrorist Organization."  Compl. ¶ 29.

Since 1984, Iran has been designated by the United States Department of State as a state sponsor of terrorism.  Pls.' MDJ, Ex. 2 ("Clawson Aff.") at 7–8.  Under 22 U.S.C. § 2656f (a), the Secretary of State provides Congress with an annual report on terrorism with respect to any country on the state-sponsor-of-terrorism list.  Id. at 8.  These reports, named "Patterns of Global Terrorism" or "Country Reports on Terrorism," repeatedly comment on the link between Hamas and Iran, and, specifically, Iran's role in sponsoring Hamas's agenda.  Id.  Hamas and Iran's relationship dates back to 1988 when the Iranian government officially accepted a Hamas delegation.  Compl. ¶ 31.  Although the level of support Iran and its instrumentalities have provided to Hamas has waxed and waned throughout the years, at various times, it has trained, funded, and supplied Hamas operatives with weapons.  See Levitt Decl. at 11; see also Clawson Aff. at 10–11.[3]  The Iranian Revolutionary Guards Corps ("IRGC"), an independent military body under the command of the Supreme Leader, has run "terrorist training camps" out of Lebanon and Iran, where Hamas members train "in the use of the short-range Fajr-5 missiles and . . . to carry out underwater suicide operations," Levitt Decl. at 11 (internal quotation marks and

---

[3] Drs. Levitt and Clawson focus their conclusions regarding the relationship between Hamas and Iran to the early 2000s.  The facts presented in this section are therefore restricted to that time period and are not intended as comments on the current status of the relationship between Hamas and Iran.

citation omitted).  While the precise figure varies, intelligence agencies across the globe agree that Iran has also provided significant sums to Hamas over the years, with estimates ranging from $3 million to $26 million dollars in a given year.  See id. at 6.  Canada intelligence, for example, reported that there was evidence "attest[ing] to the transfer of $35 million to Hamas from the [Iranian Ministry of Information and Security ("MOIS")], money reportedly meant to finance terrorist activities against Israeli targets."  Id.  The MOIS, Iran's foreign and domestic intelligence service, has been considered a "diplomatic pouch for conveyance of weapons and finances for terrorist groups."  Clawson Aff. at 7.  Furthermore, in 2000, "Tehran instituted an incentive system in which millions of dollars in cash bonuses are conferred to the organization for successful attacks."  Levitt Decl. at 7.  Hamas relies on this external funding given that it costs "$2.8 million per month . . . to run Hamas activities in the Palestinian territories."  Id. at 13. Iran has also repeatedly been caught smuggling weapons, including rocket launchers, mortar bombs, and antipersonnel mines, to Palestinian forces.  See id. at 10.  "In providing support to Hamas and other terrorist groups, [the IRGC and MOIS's] activities are tightly and carefully controlled by the Iranian government through the Supreme Leader[.]"  Clawson Aff. at 7.

In the years immediately preceding the Egged Bus Number 2 bombing, Iran's support of Hamas was especially strong.  See Clawson Aff. at 8–9 ("Iran remained the most active state sponsor of terrorism in 2002 . . . [and] 2003.").  According to a 2003 "Patterns of Global Terrorism" report, "Iran maintained a high-profile role in encouraging anti-Israeli activity, both rhetorically and operationally. . . . Iran provided . . . Hamas . . . with funding, safe haven, training, and weapons."  Pls.' MDJ, Ex. 7 at 88.  Finally, "Iran hosted a conference in August 2003 on the Palestinian intifada, at which an Iranian official suggested that the continued success of the Palestinian resistance depended on suicide operations."  Levitt Decl. at 15.

D.    Procedural History

The Cohen and Mohaber families filed suit on September 9, 2012, alleging that Iran, the

MOIS, the IRGC, the Syrian Arab Republic, and the Syrian Military Intelligence were jointly

and severally liable for the attack by providing material support and resources to Hamas.  See

Compl.[4]  Ronit Mohabber sues in her individual capacity and as a Representative for the Estate

of Neria Mohaber, who passed away prior to the commencement of this action.  See Compl.

¶¶ 18–21.  After repeated attempts to serve the Iranian defendants, Plaintiffs filed satisfactory

proof of service with this Court in June 2014.  Unable to effectuate service of process on the

Syrian defendants due to the ongoing civil war there, Plaintiffs severed them from the current

action.  The Clerk entered default against Iran, IRGC, and MOIS on March 24, 2015, and

Plaintiffs now move for default judgment.  The Court held an evidentiary hearing on the motion

on February 22, 2016, and thereafter requested supplemental evidentiary submissions from

Plaintiffs.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 55(b)(2), the Court may consider entering a

default judgment when a party applies for that relief.  See Fed. R. Civ. P. 55(b)(2).  "[S]trong

policies favor resolution of disputes on their merits," and therefore, "[t]he default judgment must

normally be viewed as available only when the adversary process has been halted because of an

essentially unresponsive party."  Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting

H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir.

1970)).

---

[4] Joseph Mohaber, Ora's older brother, joined in the original suit, but has since dismissed
his claim.  See Pl. Joseph Mohaber's Notice of Voluntary Dismissal, ECF No. 40.

Notwithstanding its appropriateness in some circumstances, "entry of a default judgment is not automatic." Braun v. Islamic Republic of Iran, 2017 WL 79937, at *4 (D.D.C. Jan. 9, 2017) (internal citation omitted). Thus, the procedural posture of a default does not relieve a federal court of its "affirmative obligation" to determine whether it has subject matter jurisdiction over the action. James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant," but "[i]n the absence of an evidentiary hearing, although plaintiffs retain 'the burden of proving personal jurisdiction, they can satisfy that burden with a *prima facie* showing.'" Mwani v. bin Laden, 417 F.3d 1, 6–7 (2005) (quoting Edmond v. U.S. Postal Serv. Gen. Counsel, 949 F.2d 415, 424 (D.C. Cir. 1991)) (internal quotation marks omitted). In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." Id. at 7.

Finally, when default is sought under the FSIA, a claimant must "establish[ ] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "The Court, therefore, may not simply accept a complaint's unsupported allegations as true . . . but may rely upon uncontroverted factual allegations that are supported by affidavits." Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 319 (D.D.C. 2014) (internal quotation marks and citations omitted).

## III.   Discussion

For the Court to enter default judgment against absent defendants, it must properly exercise subject matter jurisdiction over the claims and personal jurisdiction over the defendants, and it must ensure that plaintiffs have submitted satisfactory evidence to establish their claims against the defendants. See Braun, 2017 WL 79937, at *5.

A.      Subject Matter Jurisdiction

Foreign sovereigns are generally immune from suit in United States courts.  28 U.S.C.

§ 1604.  However, the Foreign Sovereign Immunities Act carves out narrow exceptions to this

general rule, enabling courts to exercise subject matter jurisdiction when certain conditions are

met.  See 28 U.S.C. § 1605.  One of these exceptions—covering claims against designated state

sponsors of terrorism—provides that "a foreign state shall not be immune . . . [when] money

damages are sought against a foreign state for personal injury or death that was caused by an act

of torture, extrajudicial killing . . . or the provision of material support or resources for such an

act if . . . engaged in by an official, employee, or agent of such foreign state while acting within

the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).  To establish

subject matter jurisdiction under this exception, a plaintiff must prove:

> (1) the foreign country was designated a state sponsor of terrorism at the time of
> the act;
> (2) the claimant or the victim was a national of the United States at that time;
> (3) in a case in which the act occurred in the foreign state against which the claim
> has been brought, the claimant has afforded the foreign state a reasonable
> opportunity to arbitrate the claim; and
> (4) [they] seek[] monetary damages for personal injury or death caused by torture,
> extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material
> support or resources for such an act, if engaged in by an official, employee, or
> agent of a foreign country.

Braun, 2017 WL 79937, at *6 (quoting Mohammadi v. Islamic Republic of Iran, 782 F.3d 9, 14

(D.C. Cir. 2015) and 28 U.S.C. § 1605A(a)(2)) (internal quotation marks omitted).[5]  Plaintiffs

---

[5] The third element does not apply here because the suicide bombing occurred in Israel,
not Iran.  Accordingly, plaintiffs need not establish that they afforded the defendants "a
reasonable opportunity to arbitrate."  28 U.S.C. § 1605A(a)(2); see also Worley v. Islamic
Republic of Iran, 75 F. Supp. 3d 311, 326–27 (D.D.C. 2014).

have proven each requirement, warranting the Court's exercise of subject matter jurisdiction here.

As to the first requirement, the State Department has recognized Iran as a state sponsor of terrorism since 1984.  See Beer v. Islamic Republic of Iran, 574 F. Supp. 2d 1, 6 (D.D.C. 2008). With regards to the second element, Ora and the five Cohen children have established, via supporting documentation or testimonial evidence, that they were U.S. citizens at the time of the attack.  See Evid. Tr. 14:24–15:2; Ex. 29, Ex. 1 (Meirav Cohen's Birth Certificate); Exs. 3–5 (Daniel, Orly, Shira Cohen's Consular Report of Birth Abroad); Ora Aff. ¶ 11 (attesting to Elchanan Cohen's acquisition of U.S. citizenship at birth).  Because only the claimant *or* the victim need have been a U.S. national *at the time of the attack*, Ora and her children's U.S. citizenship in 2003 is sufficient to meet the FSIA's jurisdictional requirement.[6]  Therefore, Shalom Cohen and the Mohabers' claims for solatium can be heard "because these . . . plaintiffs base their claims on injuries suffered by victims who meet the statute's requirements."  Braun, 2017 WL 79937, at *6 (citing Leibovitch v. Islamic Republic of Iran, 697 F.3d 561, 570, 572 (7th Cir. 2012)).

Lastly, Plaintiffs have met their evidentiary requirements with respect to the final element:  they have shown that Iran, MOIS, and IRGC provided material support for the extrajudicial killing undertaken by Hamas that caused them personal injury.  To begin, it is well-established by courts in this district that MOIS and IRGC are the functional equivalent of Iran, thus qualifying as "foreign states" as defined by the FSIA.  See, e.g., Murphy v. Islamic Republic

---

[6] The record is unclear as to whether the rest of the Mohaber family were already U.S. citizens at the time of the bus bombing.  Because Ora's citizenship has been established though, the status of the Mohabers citizenship in 2003 does not change the jurisdictional analysis.

of Iran, 740 F. Supp. 2d 51, 63 (D.D.C. 2010) ("MOIS is considered to be a division of the state

of Iran, and is treated as a member of the state of Iran itself."); Rimkus v. Islamic Republic of

Iran, 750 F. Supp. 2d 163, 173 (D.D.C. 2010) ("Defendant IRGC . . . [is] a nontraditional

instrumentality of Iran that acts as the military arm of a kind of shadow government answering

directly to the Ayatollah and the mullahs who hold power in Iran.").  Plaintiffs have produced

evidence—through expert declarations, direct translations of Hamas's website, and findings in

prior judicial decisions—that Hamas was responsible for planning and executing the August

2003 bus bombing.  See supra Section I.C.  The submitted evidence also indicates that Iran and

its instrumentalities had a deep-rooted history of routinely funding, training, providing

weaponry, and guiding Hamas, enabling the organization to survive and perpetuate terrorist

attacks, such as the one here.  See id.  Specifically, the IRGC has trained Hamas operatives at

terrorist training camps, and the MOIS has provided Hamas with the weapons and funds it needs

to survive and execute its operations.  See id.  "[W]here a foreign state routinely funnels money

to a terrorist organization, a plaintiff need not establish that the material support or resources

provided by a foreign state for a terrorist act contributed directly to the act from which the claim

arises to satisfy his obligation under the [FSIA]."  Valencia v. Islamic Republic of Iran, 774 F.

Supp. 2d 1, 12 (D.D.C. 2010) (internal quotation marks and citation omitted).  The evidence thus

establishes that the Iranian defendants provided "material support or resources" for the bombing

of Egged Bus Number 2 in 2003.  See 18 U.S.C. § 2339A(b)(1) (defining "material support" as

"any property . . . or service, including . . . financial services, lodging,

training, . . . safehouses, . . . facilities, . . . and transportation, except medicine or religious

materials").

Under the FSIA, an extrajudicial killing is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people."  28 U.S.C. § 1350 note § 3(a).  For purposes of subject matter jurisdiction, Plaintiffs need only establish that the bombing here was unauthorized, deliberate, and that there were casualties.  It is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply.  See Haim v. Islamic Republic of Iran, 784 F. Supp. 2d 1, 11 (D.D.C. 2011) (finding that a bus bombing was an extrajudicial killing under 28 U.S.C. § 1350 even though the plaintiff survived the attack).  Because Hamas's decision to bomb a busload of civilians was deliberate, unauthorized, and resulted in the death of 23 people, it qualifies as an "extrajudicial killing."  See id.; Beer, 574 F. Supp. 2d at 6 (holding that the FSIA state-sponsor exception applies in a case in which "a Hamas suicide bomber blew up Egged bus number 14A").  Therefore, the Iranian defendants are not immune from Plaintiffs' suit and subject matter jurisdiction lies under 28 U.S.C. § 1330(a).

B.      Personal Jurisdiction

Personal jurisdiction over foreign states exists as long as the Court can exercise original jurisdiction under 28 U.S.C. § 1330(a) and service of process meets the standards set forth by 28 U.S.C. § 1608.  See 28 U.S.C. § 1330(b).  Section 1608 permits service in one of four ways:

(1) by special arrangement for service between the plaintiff and the foreign state,
(2) in accordance with an applicable international convention on service of judicial documents, or, if the first two options are not applicable,
(3) by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or, if service cannot be made under the third option,
(4) by requesting the Clerk of the Court to send the aforementioned package to the Secretary of State in Washington, District of Columbia, to the attention of the

> Director of Special Consular Services—and the Secretary shall transmit one copy
> of the papers through diplomatic channels to the foreign state and shall send to the
> clerk of the court a certified copy of the diplomatic note indicating when the
> papers were transmitted.

Braun, 2017 WL 79937, at *7 (quoting 28 U.S.C. § 1608(a)).

No special arrangement exists between Plaintiffs and Iran, and no applicable international convention on service governs here.  After a failed attempt to directly serve the head of the Iranian Ministry of Foreign Affairs, Plaintiffs properly effectuated service via the fourth method. See Aff. Supp. Entry of Default of Iranian Defs.  Plaintiffs sent two copies (along with translations) of the summons, complaint, and notice of suit to the Clerk to send to the Secretary of State, who transmitted the documents to Iran via diplomatic channels.  Id.  The State Department filed a letter with the Court confirming that the documents were served on Iran and MOIS "under cover of diplomatic notes" on April 17, 2014.  See Aff. Serv., ECF No. 21.  The Court therefore finds that service was properly effectuated and that personal jurisdiction exists over the Iranian defendants.

C.     Defendants' Liability

All Plaintiffs, except Shalom Cohen, who is a foreign national, bring their claims under the federal cause of action that was created by Congress when it amended the FSIA in 2010.  See 28 U.S.C. § 1605A(c).  Section 1605A(c) provides that a state sponsor of terrorism shall be liable to "*a national of the United States*" or her "legal representative. . . for personal injury or death caused by [qualifying terrorist acts]" and enables successful plaintiffs to recover monetary damages including "economic damages, solatium, pain and suffering, and punitive damages." Id. (emphasis added).  This right of action, however, "provides no guidance on the substantive basis for [defendants'] liability."  Braun, 2017 WL 79937, at *8.  Thus, courts have looked to the

Restatement (Second) of Torts to define the contours of liability under the FSIA.  See id. (citing

Estate of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 24 (D.D.C. 2009)).

Ora and her five children raise battery, intentional infliction of emotional distress

("IIED"), and solatium claims for their own personal injuries and for the "extreme mental

anguish" they suffered from witnessing the physical harm inflicted upon the other family

members present during the attack.  See Compl. ¶¶ 77–118, 125–139.  Shalom Cohen, Shokat

Sadian, Orly Mohaber, and Ronit Mohabber—on behalf of herself and the estate of her father,

Neria Mohaber—assert claims for solatium, alleging that they "suffered extraordinary grief and

mental anguish as a direct and proximate result of Ora's physical injury in Defendants' terrorist

bombing."  See id. ¶¶ 122–23.  All eleven Plaintiffs seek punitive damages in the amount of

$500 million for each cause of action.  See id. ¶¶ 140–45.  The Court addresses the Iranian

defendants' liability on each set of claims below.

*1.  Ora, Meirav, Shira, Daniel, Orly, and Elchanan Cohen*

"The Iranian Defendants are liable for battery if, when they provided material support

and resources to Hamas, they acted intending to cause a harmful or offensive contact with, or an

imminent apprehension of such a contact by, those attacked and a harmful contact with those

attacked directly or indirectly resulted."  Bluth v. Islamic Republic of Iran, 2016 WL 4491760, at

*13 (D.D.C. Aug. 25, 2016) (quoting Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 76–

77 (D.D.C. 2010) and citing the Restatement (Second) of Torts § 13) (internal quotation marks

omitted)).  "Harmful contact" includes "any physical impairment of the condition of another's

body, or physical pain or illness."  Id.

Affidavits and deposition testimony submitted by Ora and her children establish that they

meet these requirements.  This Court joins a long list of its colleagues who have found that Iran

14

acted with intent to cause harmful contact when it aided Hamas's terrorist attacks, including

bombings like the one the Cohen family experienced here.  See, e.g., Braun, 2017 WL 79937, at

*9 (Hamas operative driving a car into a crowd of pedestrians); Bodoff v. Islamic Republic of

Iran, 907 F. Supp. 2d 93, 102 (D.D.C. 2012) (bombing of passenger bus in Jerusalem); Valore,

700 F. Supp. 2d at 77 (Hamas's bombing of barracks in Beirut).  In their deposition testimony,

the Cohens discuss the "harmful contact" they experienced as a result of the attack, including a

broken hip (Ex. 20, Elchanan Dep. 8:20–9:3), injuries to the head (Ex. 21, Meirav Dep. 15:23–

16:6), damage from shrapnel (Ex. 22, Orly Dep. 14:10–22; Ex. 24, Daniel Dep. 16:3–8; Evid. Tr.

24:17–22), loss of hearing (Daniel Dep. 15:14–16; Evid. Tr. 41:8–15), and facial disfiguration

and loss of vision (Ex. 23, Shira Dep. 17:1–2).  The family's injuries required hospitalization and

ongoing treatment in the form of rehabilitation, multiple surgeries, and long-term counseling.

See Evid. Tr. 41:16–25.

The family's second set of claims are for IIED, another cause of action recognized as

giving rise to liability under the FSIA.  See Reed v. Islamic Republic of Iran, 845 F. Supp. 2d

204, 212 (D.D.C. 2012).  The elements of an IIED claim are: (1) extreme and outrageous

conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff

severe emotional distress.  See Ben–Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 56

(D.D.C. 2008); see also Worley, 75 F. Supp. 3d at 336.  A suicide bombing on a crowded bus

full of civilians easily qualifies as extreme and outrageous conduct intended to inflict emotional

distress.  See Bluth, 2016 WL 4491760, at *14 ("acts of terrorism are per se extreme and

outrageous conduct"); Beer, 574 F. Supp. 2d at 12 ("Defendants' conduct, in providing material

support . . . [to] Hamas to conduct suicide bombings, is extreme, outrageous and goes beyond all

possible bounds of decency.").  It is evident from the record that Ora Cohen and her children

15

have suffered some form of severe emotional distress because of the bus bombing.[7]  See

Restatement (Second) of Torts § 46(2)(a) ("Emotional distress passes under various names, such

as mental suffering, mental anguish, mental or nervous shock. . . . The law intervenes only where

the distress inflicted is so severe that no reasonable man could be expected to endure it").  For

years, various family members were terrified to ride the bus, and they continue to suffer from

debilitating anxiety attacks, trauma, depression, and nightmares.  Evid. Tr. 54:12–15.

Lastly, these six Plaintiffs bring claims for solatium on the grounds that they also

witnessed their family members suffer injuries during the terrorist attack.  Solatium is "the

mental anguish, bereavement[,] and grief experience[d] as the result of [the victim's injuries], as

well as the harm caused by the loss of [her] society and comfort." Belkin v. Islamic Republic of

Iran, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing Dammarell v. Islamic Republic of Iran, 281 F.

Supp. 2d 105, 196–97 (D.D.C. 2003)).  Solatium claims are typically brought by family members

who were not present or injured themselves.  This case differs, however, because the entire

family was together when the bombing occurred, and thus, each "is a victim potentially entitled

to recover for his or her own pain and suffering as well as a claimant with a potentially colorable

claim to recover for the emotional trauma they endured as a result of the extreme and outrageous

---

[7] The Court recognizes, however, that "[l]ines must be drawn in the award
of . . . damages and one such line includes a situation . . . where *no* evidence is offered to show
injury that an award of solatium damages might compensate." Roth v. Islamic Republic of Iran,
78 F. Supp. 3d 379, 406 (D.D.C. 2015) (denying damages to the sibling of a decedent who
suffered from a profound intellectual disability and was unable to offer testimony as to the
mental anguish she felt).  For example, the extent of severe emotional distress suffered by
Elchanan Cohen is unclear from the record because he was barely a month old at the time of the
attack and his memories of it derive from what he was subsequently told.  See Pls.' MDJ, Ex. 20
("Elchanan Dep.") at 7:17–23 ("[Q] You have no memory of what happened . . . [A] That's right.
None at all.").  Therefore, the Court will await the special master's report and recommendation
with respect to a damages award for Elchanan's IIED and solatium claims, see infra p. 15.

conduct visited on their loved ones." Kaplan v. Hezbollah, 2016 WL 5714754, at *6 (D.D.C.

Sept. 30, 2016). The Court therefore finds that the defendants are liable to Ora Cohen and her

children on their claims for solatium.[8]

### 2. The Mohaber Family

Ora Cohen's mother and sisters also bring solatium claims based on the mental anguish

and grief they experienced due to Ora's injuries. Ronit Mohabber brings an identical claim on

behalf of the estate of her late father, Neria Mohaber. Under 1605A(c), "a solatium claim is

indistinguishable from an IIED claim." Valore, 700 F. Supp. 2d at 85 (internal citation omitted).

Courts can therefore look to cases analyzing either type of claim for guidance on the other. See

id. Recovery for solatium is generally limited to "immediate family members—parents, siblings,

spouses, and children[.]" Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 94 (D.D.C. 2014).

Acts of terrorism plainly satisfy the first two elements of an IIED claim because "[they] are by

their very definition extreme and outrageous and intended to cause the highest degree of

emotional distress[.]" Ben-Rafael, 540 F. Supp. 2d at 56 (internal citation omitted). And while

each family member must still establish the final element of an IIED claim, i.e. that he suffered

severe emotional distress, "the extreme and outrageous character of the defendant's conduct is in

itself important evidence that the distress has existed." Restatement (Second) of Torts § 46(j).

Therefore, because of the appalling and extreme nature of terrorist attacks, courts in this district

---

[8] The Court reserves judgment, however, on the number of solatium claims that can be sustained by a family member who witnesses every other member of her family experience an injury, and it will wait for the special master's report before ruling definitively on how, if at all, each incremental injury should be compensated. See Wultz, 864 F. Supp. 2d at 40 (holding that family members entitled to solatium should not receive awards that "exceed the pain and suffering awards of the surviving [victims].") (quoting O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 47–48 (D.D.C. 2012))).

have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it.  See Braun, 2017 WL 79937, at *10–11; see also Ben-Rafael, 540 F. Supp. 2d at 56–57.

### a.  Shokat Sadian, Ronit Mohabber, and Orly Mohaber

The immediate family requirement is met here:  Shokat Sadian is Ora's mother, and Orly and Ronit are her sisters.  Iran's conduct in materially sponsoring Hamas "was sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present."  Braun, 2017 WL 79937, at *10.  Shokat, Orly, and Ronit have also submitted affidavits and deposition testimony attesting to the anxiety, fear, and pain they experienced upon learning about the bombing and Ora's ongoing treatment.  See Shokat Aff. ¶ 10 (she lived in constant fear, and suffered from panic attacks, loss of sleep, anxiety); Ex. 26 ("Orly Dep.") at 20, 24–25, 28, 30 (learning of the attack caused depression, hindered her ability to work, and created new phobias); Ronit Dep. at 28–29, 38, 40 (testifying to the pain she suffered from seeing Ora's injuries directly after the bombing and her loss of ambition at work).  The Iranian defendants are therefore liable to Shokat Sadian, Orly Mohaber, and Ronit Mohabber on their solatium claims.

### b.  Estate of Neria Mohaber

When, such as here, an estate-plaintiff brings an action under FSIA's private cause of action, the plaintiff must first establish the estate's standing, or "[its] power . . . to bring and maintain legal claims."  Taylor v. Islamic Republic of Iran, 811 F. Supp. 2d 1, 12–13 (D.D.C. 2011).  "Such questions are governed by the law of the state which also governs the creation of the estate."  Id.  Neria Mohaber, Ora's father, passed away on March 3, 2009, more than five years after the bus bombing.  Suppl. Mem. Supp. MDJ, Ex. 3 ("Probate Order").  Upon Mr.

18

Mohaber's death, the Superior Court for the County of Los Angeles issued a Probate Order and designated Ronit Mohabber as the special administrator, providing her the power to "investigate and prosecute to conclusion any and all claims/suits on behalf of the decedent Neria Mohaber." Id. Accordingly, in her capacity as Mr. Mohaber's legal representative, Ronit may bring a solatium claim on behalf of his estate, and California law governs whether Mr. Mohaber's estate has standing to pursue his solatium claim.

Under California's Code of Civil Procedure, "a cause of action for or against a person is not lost by reason of the person's death[,]" Cal. Civ. Proc. Code § 377.20, "and [such] an action may be commenced by the decedent's personal representative[,]" id. § 377.30. Therefore, Mr. Mohaber's estate has standing to pursue a solatium claim, and Ronit is legally entitled to raise it on the estate's behalf. Turning to the now familiar IIED analysis, Mr. Mohaber—as Ora's father—meets the immediate family requirement. The Court has already found that the Iranian defendants' support of Hamas and its terrorist attacks qualify as "sufficiently outrageous and intentional." And Mr. Mohaber's wife and daughters have shown through testimonial evidence that he suffered at least some degree of severe emotional distress on account of Ora's involvement in the bombing. See Shokat Aff. ¶¶ 7, 9–10 ("He died with pain in his heart knowing that Ora and her children had physical injuries from the attack . . . [he] lived in constant fear that at any time Ora and her children may be killed in another attack . . . [and] could [not] watch the news and tried to insulate [himself]"); Orly Dep. at 37–40 ("it just made him a very sad person overall to the end of his life . . . just like that happiness that he had just never came back after the accident. . . . he just became a more quiet, more sad person"); Ronit Dep. at 44–45, 48 (recalling that her father, for the rest of his life, would ask for updates on Ora and the children multiple times a day and begged Ora to bring them to the U.S. to see him). Given the facts as

alleged and supported by Plaintiffs, Defendants are also liable to Neria Mohaber's estate for solatium.

### 3. *Shalom Cohen*

Courts generally "apply District of Columbia law to the claims of any plaintiffs for whom jurisdiction is proper, but who lack a federal cause of action under the FSIA." Wamai, 60 F. Supp. 3d at 89–90 (citing Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 153–57 (D.D.C. 2011)). D.C. law in turn enables foreign-national family members of terrorist attack victims, including spouses, to recover solatium damages when their allegations are reinforced by the evidence. See id. The elements of an IIED claim under D.C. law are largely indistinguishable from an IIED claim under FSIA's federal cause of action: "(1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) causes the plaintiff severe emotional distress." Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002).

As an Israeli citizen, Shalom Cohen is precluded from invoking the federal cause of action. See 28 U.S.C. § 1605A(c). D.C. law will consequently govern Shalom's claim for solatium. The first two elements are again met here. See supra pp. 14–15; see also Valore, 700 F. Supp. 2d at 77. And Shalom has further established that he suffered severe emotional distress from the bombing. Not only was he present during the attack and physically injured from it, but he was also traumatized by witnessing the injuries inflicted on his five children and former wife. See Pls.' MDJ, Ex. 25 ("Shalom Dep.") pp. 24–26; 33–39 ("I was in a very difficult emotional state. I was in a bubble. I wasn't communicating with anyone. I was completely withdrawn. I was simply pre-occupied with myself. I was in pain. I was in sorrow. I had outbursts of weeping which I still have to this day. It's chronic."). Accordingly, as with the other Plaintiffs, Defendants are liable to Shalom on his solatium claim.

IV.     **Appointment of a Special Master**

The Court has concluded that the defendants are liable to plaintiffs under the FSIA, but it reserves judgment with respect to the damages to be awarded to each plaintiff.  "In determining the proper measure of damages, [t]he courts of the United States may appoint special masters to hear damages claims brought under the state-sponsored terrorism exception to the FSIA." Taylor, 811 F. Supp. 2d at 17–18 (quoting 28 U.S.C. § 1605A(e)(1)) (internal quotation marks omitted).  The Court finds that appointing a special master in this case would not create unreasonable expense or delay and would help efficiently resolve this action.  See Fed. R. Civ. P. 53(a)(3); see also id. (appointing a special master to assess damages claims in a multiple plaintiff FSIA case).  Therefore, the Court will issue an Administrative Plan to govern the appointment of a special master to this case.  The Administrative Plan will set forth the necessary qualifications for a special master, the scope of her authority and responsibilities, and the method of compensation.

V.      **Conclusion**

As set forth above, the Court finds that Iran, the IRGC, and the MOIS are liable under the FSIA's state-sponsored terrorism exception for the harm inflicted upon the Cohen and Mohaber plaintiffs by the Hamas bombing that occurred in Jerusalem on August 19, 2003.  The Court will await the report and recommendation of the special master, however, before awarding damages. A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:    March 1, 2017