## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ORA COHEN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:12-cv-01496 (CRC) |
| ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION OF SPECIAL MASTER

This case arises out of a suicide bombing that occurred on a public bus in Israel on August 19, 2003. All seven members of the Cohen family were passengers on the bus and were injured in the attack. Plaintiff Ora Cohen and her five children seek damages for the pain and suffering associated with the physical and emotional injuries they incurred, and each seeks solatium damages related to the injuries to the other family members. Plaintiff Shalom Cohen, the former husband of Ora, who is not a United States citizen, seeks solatium damages for the injuries to his then-wife and children. Plaintiffs Shakot Sadion, Ronit Mohaber, Orly Mohaber and the estate of Neria Mohaber – parents and siblings of Ora Cohen – also seek solatium damages. None of the plaintiffs seek economic loss damages.

The Court determined that plaintiffs Ora, Meirav, Shira, Daniel, Orly and Elchanan Cohen are eligible for damages for their physical injuries, intentional infliction of emotional distress, and for solatium claims and that plaintiffs Shokat Sadion, Ronit Mohaber, Orly Mohaber, the estate of Neria Mohaber, and Shalom Cohen have solatium claims. *Cohen v. Islamic Republic of Iran*, F. Supp. 3d, 2017 WL 818208, at *8-9 (D.D.C. Mar. 1, 2017). On

105813588v.7

March 16, 2017, the Court appointed the undersigned as special master to provide a report and recommendation on the imposition of damages.  The special master appointment is governed by an Administrative Plan which outlines the required qualifications and responsibilities of the special master.  In fulfilling these responsibilities, I have reviewed all of the pleadings, the Court's order, the sworn testimony provided by the plaintiffs, translated contemporaneous medical records documenting the diagnoses and treatment of certain members of the Cohen family for injuries incurred in the suicide bombing and applicable case law.  I note that the medical records were primarily in Hebrew and that plaintiffs' counsel provided English translations.  I have accepted the translated documents as true and accurate and have requested a certification from counsel.  My Report and Recommendation is based on the above-described information, evidence and applicable case law.

### Brief Overview

On August 19, 2003, the seven members of the Cohen family were returning via bus from a visit to the Western Wall in Jerusalem.  The family members were located in different areas of the bus.  Ora Cohen was holding her one month old son.  At approximately 9 p.m., a terrorist boarded the bus and shortly thereafter detonated a bomb.  All of the members of the Cohen family were removed from the site and ultimately taken to two separate hospitals.  For some period of time after the attack and the removal to the hospitals, the family was split up and the parents did not know the whereabouts or condition of all of the children.  Each member of the family incurred some form of physical injury in the attack.  As detailed below, the collective testimony of the members of the family depict ongoing physical and emotional effects of the bombing, including, in particular, detrimental effects on family life.  The accounts provided by each of the family members – while different in terms of detail and focus – are consistent.

105813588v.7

**Factual Findings**

Each of the individual members of the Cohen family (except for Ora Cohen's parents) has provided detailed testimony about his or her experience, physical and emotional injuries and the effect of the bombing and injuries on their daily lives.  The testimony of each witness is consistent with the nature of the attack and the testimony of each of the other witnesses.  There is no reason to doubt the witnesses' descriptions of their own injuries and the injuries of the other members of the family.  In addition, plaintiffs have submitted contemporaneous medical records that both corroborate and clarify the nature of the injuries and the long term effect of the injuries. Accordingly, I accept the witnesses' description of their physical and emotional injuries coupled with the medical documentation as the basis for recommending the amount of damages.  The summaries of the testimony below along with the summaries of the medical documentation constitute the factual findings upon which the recommended damages awards are based.

*Ora Cohen*.  Ora Cohen testified at a hearing before the Court on February 22, 2016.  She explained that the family – Ora, Shalom, and the five children – had traveled to the Western Wall in Jerusalem.  They wanted to celebrate and give thanks for "five beautiful, healthy, happy children."  Evid. Tr. 17:8-9.  They were on their way home on a bus when a terrorist boarded the bus and detonated a bomb.  *Id.* at 17:21-19:00.  Mrs. Cohen had been nursing her youngest child at the time.  When the bomb detonated she felt a strong force and the baby fell from her arms. *Id.* at 19:23-25.  A man took her out of the bus and during this time she did not know what had happened to her children.  *Id.* at 20:20-21:16.  She was taken to a hospital and several hours later she was informed that rescuers had found three of the children and that they were in the same hospital.  *Id.* at 22:6-23:7.  After another hour, she was informed that the baby was alive but in a different hospital.  *Id.* at 23:8-14.  Several hours later – approximately eight hours after the

bombing - she finally learned that her daughter Shira was alive but also in a different hospital. *Id.* at 23:15-24:8.

Mrs. Cohen was in the hospital for nine days. *Id.* at 40:24-41:2. She had an injury to her neck and a broken nose, and she suffered some ongoing hearing loss. She had surgery to address the injury to her eardrum. *Id.* at 41:16-42:4. She described the right eardrum as "completely gone." *Id.* at 40:24-41:22. She continues to have "hurt" in her ears. *Id.* at 41:9-10. Ora Cohen indicated she had had multiple surgeries but did not provide details about each of those surgeries. *Id.* at 41:16-42-4. She did state that about 3 weeks after the attack she was in a wheelchair and that she had difficulty hugging her children. *Id.* at 31:15-16, 35:25-36-3, 37:20-21. Ora Cohen testified extensively about the condition of her children and the various surgeries, treatments, and counseling they received. She testified about the extreme anxiety she felt and continues to feel regarding her children and their physical and emotional injuries. Ora Cohen testified that her daughter Shira was badly injured. Ora Cohen testified that Shira had shrapnel on her face, chin, hand, stomach, and leg and that she underwent surgery the day after the attack. *Id.* at 29:23-30:13. Ora Cohen testified that the social workers at the hospital told her that Shira "looks horrible." *Id.* at 31:23-24. Ora Cohen described Shira's appearance shortly after the initial surgery as "swollen" and "dark." *Id.* at 32:8-9. She did not even recognize her child. *Id.* at 32:2-6. Ora Cohen testified that Shira was swollen because of infection and that she had a lot of stiches in her face. *Id.* at 33:1-4. Ora Cohen testified that Shira had to endure additional surgeries and that pieces of shrapnel would from time to time fall out of her body. *Id.* at 36:9-23. The doctors told Ora Cohen that one of Shira's eyes would have to be removed. *Id.* at 33:9-12. About 3 weeks after the attack, another doctor suggested an examination to determine whether the eye could be saved. *Id.* at 37:16-25. According to Mrs. Cohen, the retina in Shira's eye was

ruined and the natural lens was cut.  The doctors put silicone oil in the eye to keep it together.

*Id*. at 38:4-17.  Shira still has the eye but it is not healthy and it looks different than her other eye.

*Id*. at 38:18-22.  Ora Cohen testified that Shira's face looks damaged and that when Shira goes

out, people comment on her appearance.  *Id*. at 39:3-19.  Ora Cohen testified that the baby –

Elchanan – suffered a broken hip in the attack but did not require surgery.  Elchanan was in the

hospital for approximately 9-10 days.  *Id*. at 43:7-17.  Ora testified that her daughter Meirav has

completely lost hearing in her left ear and that Meirav was "weak" in school because of her

hearing loss.  *Id*. at 44:7-12.  Meirav continues to see a psychologist.  Ora testified that her child

Daniel continues to have problems with hearing and he is still very scared.  He will only use

buses for travel if there is no other choice.  *Id*. at 50:17-22.  Ora states that Daniel still has

shrapnel in his leg.  *Id*. at 51:19-21.  Ora testified that her daughter Orly has pain in her ears,

some reduction in hearing and shrapnel in her back near the spine that hurts.  *Id*. at 52:4-9.  Orly

also has shrapnel in her leg.  *Id*. at 53:12-14.  Ora testified that Orly is "really miserable."  *Id*. at

54:6.

Ora testified that the injuries to her children were emotionally hard for her.  *Id*. at 44:13.

Ora testified at some length about the burdensome time obligations and the fact that her former

husband was unable to cooperate to assist.  *Id*. at 45:8-11.  Ora has to take the children to their

hospital treatments early in the mornings.  She had to find babysitters to care for the children.

She described herself as "bleeding in my heart" because she was a "good mother" before the

attack and after the attack she was not able to be home for her children.  *Id*. at 46:9-10.  Instead,

she had to take care of Shira and take Shira, Meirav, and Daniel for surgery or treatment.  For

example, every Tuesday for approximately four years she had to take Shira to a psychology

treatment in the morning and take Daniel and Meirav to treatments in the afternoon.  *Id*. at 45:14-

47:24.  Ora testified that she, Shira, and Orly were in a second attack, nine years after the 2003

attack.  Orly was very scared and regressed after that second attack.  *Id*. at 54:9-13.  Ora Cohen

is scared and when she sees a fat man, she is scared that the person might be a terrorist.  *Id*. at

60:18-22.  Ora Cohen testified that her marriage was affected by the event and ultimately Ora

and Shalom were divorced.  *Id.* at 68:4-69:10.  She testified that her life was consumed by caring

for her children and that she had an extremely difficult time managing and providing appropriate

care in part because she accompanied her children to their various treatments, surgeries, and

hospitalizations.  *Id*. at 66:23-69:14.

Ora Cohen has submitted a medical report from Dr. Nazryan, an ENT physician in

Jerusalem, dated June 18, 2017.  The record states that   that the diagnoses of the injuries to Ora

Cohen as of August 19, 2003 (the date of the bombing) were:  Perforation of tympanic

membrane, noise induced hearing loss and "accident/injury."  The June 2017 record outlines the

continued effect of these injuries.  The physician recommended a seal for the right ear and

further noted ongoing congestion in the nose.  Ora Cohen has also submitted medical reports

documenting her emotional and psychological diagnoses and treatment.  In a series of reports

dated in 2004 and 2005, Dr. Omer Bonne, a psychiatrist, concluded that Ora Cohen suffered

from PTSD and Major Depressive Disorder.  According to the reports, Ora Cohen was attending

various types of therapy sessions and was expected at the time to continue frequent therapy.

Exh. A.

*Shira Cohen*.  Shira Cohen testified under oath by videoconference on February 17, 2016.

Shira was about one and a half years old at the time of the bombing.  She does not recall the

event but has heard about it from her family.  She stated that they typically talk about the

bombing after she returns from her treatments – because the treatments are necessary to address

the injuries she incurred in the bombing.  Shira testified that the vision in her left eye is "[n]ot like a regular eye."  Pls.' Mem. Supp. Mot. Default J. ("Pls.' MDJ") Exh. 23, Shira Cohen Dep. 10:4-5.  She continues to receive treatments and examinations from three doctors for her eye injury.  *Id*. at 12:6-11.  She gets drops in her eye five times a day.  *Id*. at 17-19.  She has pain and itching in her eye.  *Id*. at 13:10-13.  She has pieces of shrapnel in her chin that had hurt for some time but no longer bother her.  *Id*. at 14:24-15:2.  Shira testified that it is "[v]ery hard" – because people stop her on the street because she does not have a regular eye and because she has scars. *Id*. at 17:1-18:6.  Shira testified that she is worried about going to a new school because of the damage to her face.  *Id.* at 17:10-17.  Shira testified that she thinks "often of terrorists."  *Id*. at 18:17.  She dreams about it and has a hard time falling asleep.  *Id.* at 18:20-19:4.  She gets "very scared" if someone who appears fat gets on the bus with her.  *Id*. at 19:8-21.  She is scared of surgery.  *Id*. at 20:5-6.  Shira often talks to her mother and some of her siblings about the fact that people frequently ask her what happened because of the scars she has on her face.  *Id*. at 21:5-22:19.  Shira testified that her mother gets upset because of her own hearing problems and one of her sisters still has glass in her body.  *Id*. at 24:22-25:5.  Shira also expressed concern about the effect of her appearance on her future.  *Id*. at 27:5-19.

Shira has provided medical records from Hadassah University Hospital Ein Kerem Jerusalem that support her testimony and provide additional relevant details about the nature and severity of her injuries.  Specifically, records of evaluation and treatment on January 8, 2016 and February 11, 2016 show diagnoses of glaucoma associated with ocular trauma and corneal scar and a recommendation to continue using artificial tears in the left eye.  Records from an evaluation on May 23, 2016 provide more details about the injury to and status of the left eye. Based on various tests, the left eye was described as having a dry hazy cornea and irregular

epithelium with a diagnosis of glaucoma due to trauma.  The record notes that Shira had had

multiple surgeries.  The medical record from an evaluation performed on May 23, 2016 states

that Shira had seven surgeries on her retina.  Shira underwent tests to determine visual potential

and the conclusion was that there is no visual potential in the eye and that she is not a candidate

for corneal transplant. The diagnosis is aphakia in the left eye– which is the absence of a lens due

to surgery or wound.  The medical documents confirm that Shira has a permanent loss of vision

in the left eye and trauma related glaucoma that requires daily treatment and frequent medical

evaluations.  Exh. A.

*Meirav Cohen*.  Meirav Cohen testified by videoconference deposition on February 17,

2016.  Meirav was born in 1995 and was about seven years old at the time of the bombing.

Meirav recalls being on the bus and the bombing.  Pls.' MDJ, Exh. 21, Meirav Cohen Dep. 14:3-

15:18.  Meirav says she initially lost consciousness and woke up to find blood all over her head.

She recalls seeing strange objects and feeling weak.  *Id*. at 15:20-16:12.  She recalls chaos and

screaming as passengers tried to get off the bus.  *Id*. at 17:4-5.  She saw a woman whose arm had

been severed.  *Id*. at 18:12-15.  She remembers seeing injured people all over.  She saw her

father holding her sister.  She recalls that her father had blood and shrapnel on his face and neck

and that her sister looked worse.  *Id*. at 19:16-20:7.  She was very afraid after seeing her father

and sister.  *Id*. at 21:6-13.  She went to the hospital and remembers waking up in the hospital and

asking for her mother.  *Id*. at 16-20.  She said her mother looked lost, that she had been crying.

*Id*. at 22:2-5.  She said she could barely hear because her ears had been "hurt."  *Id*. at 22:20-21.

After a few days the hospital put the siblings together.  She described her sister Orly as

"miserable."  She recalled that her brother Daniel had bandages on his face.  *Id*. at 23:5-19.  She

did not see her younger brother for several days.  She did not see her younger sister Shira for a long time.  She described Shira as "distorted."  *Id*. at 25:20-22.

She suffered some initial hearing loss and currently does not hear well.  She uses a hearing aid in her left ear.  *Id*. at 27:4-5.  She testified that she has had many painful ear infections and that she cannot use the hearing aid when the ear is infected.  *Id*. at 28:3-16.  She said doctors have told her that if she has more infections, she could lose her hearing permanently.  *Id*. at 28:18-19.  She also experiences skin reactions when she is stressed.  *Id*. at 29:15-18.  She still has scars on her face and on her leg and arm.  *Id*. at 31:7-11.  Meirav and two of her siblings were released from the hospital and spent a long time with a babysitter before her parents and other two siblings returned home.  *Id*. at 33:15-34:1.  She described her parents as dysfunctional when they returned home.  *Id*. at 34:1-9.  She has had several tests for her hearing and testified that she had trouble sleeping.  She had a recurring dream and often wet her bed.  *Id*. at 34:22-36:14.  She underwent psychiatric treatment.  *Id*. at 36:14-24.  She also had other therapeutic treatments.  *Id.* at 39:7-22.  She testified that before the attack, her home life was calm.  After the attack, her mother could not hear well, her father was detached, and her parents were dysfunctional.  *Id*. at 41:12-17, 43:3-7.  She said her home just fell apart.  *Id*. at 43:2-3.  She is close to her sister Shira and testified that Shira suffers a lot of pain and goes through a lot of therapy.  *Id*. at 45:1-6.  She testified that Shira's face is scarred and that everyone thinks Shira is disfigured.  *Id*. at 44:21-46:14.  Meirav has periods of nightmares and she is working with a psychologist to help her function.  *Id*. at 47:6-9.

Meirav submitted medical records from the Ein Kerem Clinic in Jerusalem dated September 1, 2016, December 25, 2016 and March 30, 2017 showing the following diagnoses: Blast trauma bilateral, hearing impairment bilateral, tympanic membrane perforation of the right

ear, tinnitus (ringing in the ears) and sensorineural hearing loss – severe in the left ear.  Records from July 31, 2014 indicate that Meirav was tested with hearing aids that provided some improvement at the time.  The medical record from September 1, 2016 reports moderate to severe damage to the right ear and a "deep disability" in the left ear.  Records from March 30, 2017 note further issues with the right ear – described as the only ear that "hears."  The physician recommends against surgery apparently because she has no hearing in her left ear.  The medical records confirm that Meirav effectively has a permanent loss of hearing in the left ear and significant loss of hearing in the right ear.  They further confirm that Meirav suffers from ongoing discharges and problems resulting from the damage to her ears.  A discharge report from the Shaare Zedek Medical Center dated shortly after the attack in August 2003 indicates that Meirav suffered lung contusions the attack.  In addition, Meirav submitted medical records documenting the psychological effects of the attack.  Dr. Fortu Ben-Arroch, a child and adolescent psychiatrist reported that Meriav suffered significant effects from the attack including regression, nightmares, violent reactions and abnormal responses.  Exh. A.

*Orly Cohen*.  Orly Cohen testified in a videoconference deposition on February 17, 2016.  Orly was about four years old at the time of the attack.  She recalls being on the bus and remembers losing her shoe and hearing screams and noise.  Pls.' MDJ, Exh. 22, Orly Cohen Dep. 8:9-17.  She remembers being carried and recalls being in the hospital.  *Id*. at 10:14-20.  She remembers tests at the hospital.  She remembers seeing her siblings Daniel and Meirav at the hospital.  *Id*. at 11:3-22.  She does not recall seeing her parents or other siblings at the hospital.  *Id*. at 12:9-21.  She has pain in her back and gets infections periodically because of glass that is still in her body.  *Id*. at 14:13-18.  The glass is located in the upper back close to the spine (based on visual demonstration in deposition).  *Id*. at 16:1-4.  She also has glass in her leg and foot.  *Id*.

at 17:2-7.  She testified that her ears were affected and she sometimes doesn't hear well but she does not think her ears were really damaged.  *Id*. at 17:22-24.  She recalls glass coming out of her foot and that at the time it hurt to put pressure on her leg.  *Id*. at 17:3-18:24.  She has scars on her back and leg.  *Id*. at 19:12-15.  She talks to her sister Shira about the bombing.  *Id*. at 19:22-20-3.  Orly has a lot of fears and scary dreams.  *Id*. at 21:9-23.  She is scared when she rides on a bus.  *Id*. at 22:12-15.  When she recalls the attack she cannot concentrate and has trouble at school.  *Id*. at 23:19-20.  She feels bad for her sister Shira who has to go for treatments.  *Id*. at 26:7-10.  She testified that her household is very difficult:  her mother is preoccupied by Shira.  *Id*. at 26:23-24.  It is hard for her to look at her father because of his facial injuries.  *Id*. at 27:19-20.  She said her youngest brother was not injured that much and that her brother Daniel's injuries affected her "a little."  *Id*. at 28:15.  Her home "fell apart" after the terror attack:  Shira goes to treatments; her mother is not home that much and it hurts to see her mother that way.  *Id*. at 29:4-30:6.

Orly's medical records show diagnoses of blast trauma, acoustic trauma (explosive) to both ears and tympanic membrane perforation which was reported as resolved as of August 6, 2014.  A medical record from 2015 documenting evaluation and treatment at the Hadassah University Hospital in Jerusalem indicates that Orly has ongoing complaints of hearing loss and notes a mild chronic changes in the eardrum resulting from the 2003 attack. The physician recommended additional hearing tests at that time.  Orly has also provided a letter dated May 17, 2004, from a social and psychotherapeutic worker at the Post Traumatic Child and Adolescent Clinic to the Education Administration, Municipality of Jerusalem regarding placement for Orly in an integration kindergarten in light of the severe difficulties experienced by Orly and her family as a result of the attack. Exh. A.

*Daniel Cohen*.  Daniel Cohen testified by videoconference deposition on February 17,

2016.  Daniel Cohen was born on May 8, 1997.  He was six years old at the time of the bombing.

He recalls sitting on the bus and then finding himself outside the bus not knowing what was

going on.  Pls.' MDJ, Exh. 24, Daniel Cohen Dep. 8:18-20.  He recalls feeling like there was a

hole near his mouth and seeing his mother on the floor.  He saw his father crying.  *Id*. at 8:20-24.

He saw his mother and said "it was scary." *Id*. at 12:7.  He was taken away in an ambulance and

remembers being very afraid.  *Id*. at 8:24-9:3, 13:7-8.  He felt pain near his mouth.  *Id*. at 12:20-

23.  He was taken to a hospital and received stiches in his lip.  *Id*. at 13:13-22.  He remembers he

was confused.  *Id*. at 14:3.  He does not remember pain other than the wound in his lip until later.

He recalls blood coming from his ears and that his ears were painful and he could not get up

from the bed.  He needed assistance to walk.  *Id*. at 15:15-22.  He has scars on his legs and on his

forehead.  *Id*. at 16:3-5, 21:12-15.  He said it was "hard" to look at his sister Shira because she is

covered in scars.  *Id*. at 18:23-19:2.  His hearing is still affected and is "[n]ot so good." *Id* at

20:6.  He continues to hear whistling and ringing in his ears.  *Id* at 20:9-10.  When he returned to

school he was afraid.  *Id*. at 24:2.  He was afraid of fat people because he felt that the terrorist

was a large man although he did not see the terrorist.  *Id*. at 25:3-10.  He still suffers from

insomnia.  *Id*. at 26:2.  For about a year after he came home from the hospital he rarely spoke.

*Id*. at 27:13-15.  His parents were not really able to take care of him after the event.  *Id*. at 28:6-

12.  He did not receive psychological treatment.  He gets frightened and depressed when he hears

of terrorist attacks.  *Id*. at 30:4-19.  He does not like to go to public places, and he fears for his

family.  *Id*. at 30:22-23.  He is very sad about the injuries to his sister Shira.  *Id*. at 32:20-21.

*Elchanan Cohen*.  Elchanan Cohen testified by videoconference deposition on February

17, 2016.  Elchanan was slightly more than a month old at the time of the attack.  He does not

recall the attack but has been told about it by his family.  Pls.' MDJ, Exh. 20, Elchanan Cohen
Dep. 7:17-23.  Elchanan fell from his mother's arms and ended up underneath the body of the
terrorist.  *Id*. at 8:7-10.  (This statement is consistent with the testimony of other family
members.)  He suffered a break in the pelvis and hip area.  *Id*. at 8:14-23.  He is aware that his
siblings suffered some injuries.  He knows that his sister Shira is still in pain as a result of the
attacks.  It was hard growing up in the household because his mother had to keep going to
treatments with Shira.  *Id*. at 12:9-19.  He keeps thinking about how hard it is for his mother to
travel so much and help Shira.  *Id*. at 14:9-16.  He has bad dreams about bombings.  *Id*. at 15:14-
18.  He is afraid to ride the bus alone to the Western Wall because of what happened to his
family.  *Id*. at 17:12-21.

Elchanan's medical record shows that he was seen by Dr. Nazryan, an ENT physician,
for hearing complaints on June 18, 2017.  The test results showed normal hearing function.  Exh.
A.

*David Shalom Cohen*.  David Shalom Cohen is the former husband of Ora Cohen and the
father of the five children injured in the bombing.  David Shalom Cohen testified under oath by
videoconference deposition on March 29, 2016.  David Shalom Cohen testified that in 2003 he
was a road contractor and he was working on building infrastructures for road construction.  Pls.'
MDJ, Exh. 25, David Shalom Cohen Dep. 6:22-7:1.  He also worked for a year or two in
carpentry.  In 2003 he was the sole support for his family.  *Id*. at 7:2-18:  On August 19, 2003 he
was on a bus traveling from the Western Wall in Jerusalem.  The bus had reached Beit Orot
Square.  *Id*. at 8:11-9:12.  He was holding his daughter Shira in his arms and was sitting
approximately 3-5 meters away from Ora and the other children.  *Id*. at 9:16-21.  He testified that
the "terrorists" boarded the bus at Orot Square and about seven or eight seconds after that, he felt

darkness and "a blow." *Id*. at 10:6-14.  He described the bus as "shattered." *Id*. at 11:15-18.  His

face was "completely ripped to shreds." *Id*. at 22-23.  He felt that he was "moments away from

death." *Id*. at 12:2-3.  He was still holding Shira.  *Id*. at 12:5.  He had to walk on bodies to get

out of the bus.  *Id*. at 12:13-14.  Someone removed Shira from his arms and he then lost

consciousness.  *Id*. at 12:18-22.  Before that, he saw his wife and one of his children lying on the

ground.  *Id*. at 13:10-19.  He did not know whether Shira was alive or dead and he did not see the

other children.  *Id*. at 13:20-14:18.  Later he was told (erroneously) that his youngest child had

been killed.  *Id*. at 14:1-2.

He testified that his face was torn to shreds by shrapnel and that his hearing was

damaged.  His eye was also damaged.  *Id*. at 15:20-16:22.  He had eight or nine surgeries to

remove shrapnel and dozens of stiches on his face.  *Id*. at 16:1-7.  He was hospitalized for about

seven weeks after the bombing.  *Id*. at 26:20-21.  He still has "intolerable" ringing in his ears,

cannot hear out of his right ear and has only fifty- to sixty-percent hearing in the other ear.  *Id*. at

16:17-22, 20:15-23.  He still has shrapnel in his lips, eyelid, arm, and cheeks and has been told

that additional surgery could result in partial paralysis.  *Id*. at 18:13-20:11.  The ringing in his ear

bothers him and makes him nervous.  *Id*. at 23:9-16.  He is not able to work in carpentry because

he cannot be around heavy machinery.  *Id*. at 23:21-24:11.  Because of the damage to his ears he

has balance problems and is not able to walk normally.  *Id*. at 24:22-25:3.  He did not see his

children for two or three weeks after the bombing.  *Id*. at 31:4-7.  He was originally told that his

youngest child had been killed but later learned that this child (who was only about a month old

at the time) was found underneath the body of the terrorist.  *Id*. at 30:1-2, 32:5-14.  He did not

see this child (Elchanan) for about two and a half months after the bombing.  *Id*. at 32:15-18.  He

testified that when he first saw his daughter Shira – about two or three weeks after the bombing –

she did not look like a little girl.  He said she looked like a monster.  *Id.* at 31:14-15.  He still has not recovered from the trauma of seeing his child in that condition.  *Id.* at 20-21.  He stayed with Shira during her initial hospitalization.  *Id.* at 32:22-33:10.  He is still receiving psychological and psychiatric treatment.  *Id.* at 34:4-5.  At one point, he was advised that he should be hospitalized for his "emotional difficulties in dealing with the after-effects on [himself] and [his] wife and [his] children."  *Id.* at 34:11-15.  He has chronic bouts of weeping, pain and sorrow.  *Id.* at 34:20-22.  He continues to take medication for his emotional difficulties and finds that the medication interferes with normal functioning.  *Id.* at 35:16-19.  He had never had psychological problems or treatment before the bombing and had never had physical pain in the affected areas before the bombing.  *Id.* at 36:8-16.  He testified that the effects of the bombing ultimately caused his divorce from Ora.  *Id.* at 36:21-24.  Ora and David Shalom were divorced – after 16 or 17 years of marriage – on January 30, 2013.  *Id.* at 37:5-7.  He testified that his relationship with his children was affected by his emotional difficulties.  *Id.* at 41:1-42:8.

*Ronit Mohaber.*  Ronit Mohaber testified by videoconference deposition on March 29, 2016.  Ronit is a sister of Ora Cohen.  Ronit testified that the family (Ora Cohen's parents and siblings) have always had a "close knit" relationship.  Pls.' MDJ, Exh. 27, Ronit Mohaber Dep. 7:19-20.  Her relationship with Ora was as close as one could imagine between sisters.  *Id.* at 7:24-25.  Ronit is very close to Ora's children.  She speaks with Ora's children by phone "mostly on a daily basis."  *Id.* at 9:1-11.  On the day of the bombing Ronit received a collect call from Ora who informed her that there had been a bus bombing and that Ora and her family had been on that bus.  *Id.* at 11:1-15.  Ronit "got panicked" and described Ora as panicked and scared.  *Id.* at 11:16-17.  She contacted her sister Orly.  They started to contact hospitals in Israel to get more information.  *Id.* at 13:15-16:12.  She called Ora frequently but initially Ora was not able to walk

to the telephone because of vertigo she experienced due to the damage to her ears. *Id.* at 17:4-17.  Ora was on the news in Israel trying to find her two younger children who had been taken to a different hospital.  *Id.* at 18:19-24.  She was constantly searching for more news.  Ronit and her sister Orly continued to be distressed about the events and cried "badly" at the end of that week. *Id.* at 24:4-26:15.  She saw a magazine article with a photo of Ora being carried to the ambulance.  She described her sister as "bloody."  *Id.* at 26:18-28:12.  She was traumatized.  *Id.* at 29:19.  She described receiving a photo of Shira about a month after the attack.  Shira had scars on her face and a badly damaged eye.  *Id.* at 34:4-15.  She felt the pain of the injuries to her niece and her sister like a stabbing to the heart.  *Id.* at 37:6-19.  Ronit could not work and her thoughts were not on her studies.  *Id.* at 38:1-25.  She ultimately gave up her position as an actuary and became a data analyst.  She attributes that change to a lesser position to the trauma of the bombing.  *Id.* at 40:5-18.  Ronit traveled to Israel in 2009 and at that time three of the children still had shrapnel in their bodies.  *Id.* at 41:10-20.

For a period of time the family shielded Ora's parents from the news of the bombing. Eventually they told the parents and were able at that time to share photos of Ora to reassure them that Ora and the children were alive.  Shortly before he passed away, Ora's father asked Ora to bring the children to see him.  She said it was hard because of all the doctor's visits.  The father never got to see the children before he passed away.  Ronit testified that the experience changed her mother.  The mother suspected that she did not have the truth about the condition of the children.  Her father asked about Ora and the children almost daily.  *Id.* at 43:11-47:11. Ronit testified that her mother couldn't "take it."  *Id.* at 47:20-48:7.  She noticed a change in her father and felt he was more depressed.  *Id.*  It is difficult to talk to Ora because Ora does not hear well.  *Id.* at 49:1-7.

105813588v.7

According to Ronit, Ora had nose surgery.  Ronit visited Israel in 2009 and was traumatized by the sight of Shira's face.  *Id.* at 49:12-50:20.  Ronit testified that the attack affected Ora's marriage.  *Id.* at 52:1-25.  She testified that Ora was affected emotionally by the attack explaining that Ora is paranoid and anxious all the time.  *Id.* at 53:23-25.  Ronit testified that she is paranoid as a result of the attack and that the bombing made her weak emotionally. She experienced sleep disturbances.  *Id.* at 54:1-55:18.  When people comment on her niece Shira's facial features, she experiences emotional pain.  *Id.* at 60:2-21.

*Orly Mohaber.*  Orly Mohaber testified by videoconference deposition on March 29, 2016.  Orly is a sister of Ora Cohen.  Orly lives with her sister Ronit and her mother.  Pls.' MDJ, Exh. 26, Orly Mohaber Dep. 5:23-24.  Her father also lived with them before he passed away. *Id.*  She has an extremely close relationship with Ora and describes Ora as a "mother" to her.  *Id.* at 8:2-3.  She speaks to Ora nearly every day.  *Id.* at 8:14.  She considers Ora's children to be the babies she never had and speaks to them frequently.  She learned of the bombing from her sister Ronit.  When she heard that Ora was in a bus bombing, she was "paralyzed."  *Id.* at 7:23-11:18. It was worse because she was on the other side of the world and there was nothing she could do. *Id.* at 12:13-20.  She called the hospital to get some details.  She found out that Elchanan was alive, but because she did not get the details of his condition she imagined the worst scenario. *Id.* at 13:21-14:23.  She and her sister Ronit kept searching for information on the internet.  The trauma affected her work performance.  *Id.* at 19:6-20.  She believes that her lack of performance led to her needing to find a new job.  *Id.* at 20:3-8.  For a period of time she and her sister Ronit hid the information from their parents.  They did not want the parents to know of the bombing because they feared that the parents could not handle the stress.  *Id.* at 21:22-24.  There was no way either of the parents could have handled it before they knew the condition of Ora and the

children.  *Id.* at 22:6-8.  The bombing occurred on a Tuesday, and the following Friday Orly and

Ronit broke down.  *Id.* at 24:5-25:16.  Orly felt an inner conflict because this was such a big

tragedy but she was limited in what she could do.  She would feel faint and "being like a robot."

*Id.* at 26:8-20.  She lost weight.  After the bombing she could not handle the stress of work.  *Id.*

at 27:9-29:14.  The experience changed her for life.  *Id.* at 30:19-22.  She is always on high alert.

*Id.* at 31:2.  When she hears from her sister Ora, she thinks something has happened.

When Orly and Ronit finally told their mother, Shokat Sadian, about the bombing, Shokat

did not "handle it well."  *Id.* at 31:3-34:22.  Shokat started crying, and when Ora's father Neria

Mohaber came home and found out, he also did not handle it well.  *Id.* at 34:22-35:12.  They

were concerned because Shokat had already had a stroke.  Orly described Shokat as becoming

more anxious after learning of the bombing.  *Id.* at 35:13-36:18.  Shokat's anxiety never went

away.  *Id.* at 36:19.  Neria was always more quiet but after learning of the bombing he would

constantly ask about Ora.  *Id.* at 37:5-20.  Orly testified that the bombing made Neria a very sad

person to the end of his life.  *Id.* at 38:1-2.  Neria wanted to see Ora's children but they could not

travel and he never did get to see them before he died.  *Id.* at 39:1-6.  The bombing left a really

"big mark" on Neria.  *Id.* at 39:20-21.  Every day he would check and get an update on Ora and

the children.  *Id.* at 40:4-13.  Orly was in Israel visiting shortly before the bombing.  She recalls

that Shira was cute and adorable.  When she saw a picture of Shira after the bombing she thought

that there was no way it could be Shira.  She felt Shira did not look the same and was completely

deformed.  *Id.* at 43:23-44:10.  She described Shira as deformed and that kids stare at Shira.  *Id.*

at 45:1-14.  Shira has dents all over her body and her eye looks different.  She does not look like

a normal child.  *Id.* at 45:15-21.  It is painful for Orly to see Shira like that.  Orly testified that

Ora's entire back was burned in the bombing and that she pretty much lost hearing in one ear

105813588v.7

"for life." *Id.* at 48:5-9. Ora often cannot hear her when they talk on the phone. Orly testified

that Ora had surgery on her nose and on her ear. *Id.* at 48:22-50:13. Orly testified that Meirav

has many scars. *Id.* at 55:11.

### Determination of Amount of Damages

In evaluating the recommended amount of damages for each plaintiff, I am guided by

multiple prior decisions in this district awarding damages to victims of terrorism and the

recognition that damages awards should be generally consistent. *See, e.g., Wamai v. Republic of

Sudan,* 60 F. Supp. 3d 84, 91 (D.D.C. 2014). In these situations it is difficult to place a dollar

value on pain and suffering, particularly in the case of terrorist attacks where the physical,

emotional and mental injuries vary but where their effects may be severe and long

term. Decisions in previous cases provide guidance, but, of course, each individual's situation

and extent of injury is different. In determining an appropriate award, it is necessary to consider

the nature of the injury, the pain associated with that injury, the duration of that hospitalization,

and the degree and length of any impairment. *See Peterson v. Islamic Republic of Iran*, 515 F.

Supp. 2d 25, 52 n. 26 (D.D.C. 2007) ("*Peterson II*"), *abrogation on other grounds recognized in

Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015) (*citing Blais v. Islamic

Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006). Each plaintiff (except the parents of

Ora Cohen) has testified either in a hearing before the court or via deposition. The testimony of

each of the family members is consistent, and each family member has corroborated the

testimony of other family members. *See Bluth v Islamic Republic of Iran,* 203 F. Supp. 3d 1, 23

(D.D.C. 2016) (citing evidentiary hearing and depositions to establish award for pain and

suffering plaintiff experienced during and since the attacks); *Moradi v. Islamic Republic of Iran*,

77 F. Supp. 3d 57, 72 (D.D.C. 2015) (citing spouse's declaration in awarding solatium damages

consistent with framework of *Heiser v. Islamic Republic of Iran*, 466. F. Supp. 2d 229 (D.D.C. 2006).  In addition, as noted, several of the plaintiffs have provided contemporaneous medical records and reports that corroborate and embellish their testimony regarding their injuries and the ongoing effects of those injuries.

In a series of cases, the courts in this district have established certain guideposts for the amount of damages for different types of claims and injuries in the context of claims based on the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C.A. §§ 1330, 1602-11.  The statute provides a state-sponsored terrorism exception that provides a federal right of action codified at 28 U.S.C. § 1605A.  In *Peterson II* the awards for surviving victims ranged between $2 million and $12 million.  *Peterson II* adopted a "baseline" of $5 million for persons suffering injuries in terrorist attacks.  *See also Davis v. Islamic Republic of Iran,* 882 F. Supp. 2d 7 (D.D.C. 2012).  The baseline amount of $5 million is adjusted upward or downward to reflect the severity of the injuries, both physical and emotional.  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010).  In *Valore* the court explained that it will "depart upward from this baseline to $7 to $12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead."  *Id.*[1]  In general, victims with long-term injuries or long-term effects of injuries receive higher awards than victims whose injuries are temporary or promptly healed.  In *Dammarell v. Islamic Republic of*

---

[1] In *Peterson II,* for example, victims with skull fractures, crush injuries and damaged ear drums received upward adjustments that resulted in damages awards ranging from $7 million to $9 million.  Victims with minor shrapnel injuries and lacerations received downward adjustments resulting in smaller amounts in the range of $2-$3 million.  I note that certain earlier cases awarded higher amounts for severe injuries (*see Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 266, 274 (D.D.C. 2003) (awards included those for $12 million and $17 million for severe and permanent injuries). I rely on the more recent line of cases that have set forth protocols and general framework for the determination of damages.

*Iran*, 404 F. Supp. 2d 261, 293, 324 (D.D.C. 2005), the court issued awards of $750,000 for temporary and minor injuries.  Courts have also applied downward adjustments where claims of permanent injury (such as permanent hearing loss) are not substantiated by medical records. *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 45-46 (D.D.C. 2016).  For victims who suffer severe emotional injury without physical injury the courts have awarded damages in the range of $1.5 million.  *Valore*, 700 F. Supp. 2d at 85; *Peterson II*, 515 F. Supp. 2d at 56.  Thus, in determining the appropriate damages award, it is necessary to evaluate each individual's physical and emotional injuries along the spectrum of severity established in prior decisions.

Solatium damages provide compensation for mental anguish and grief based on a close personal relationship to the victim.  Solatium damages compensate both for mental anguish and grief as well as for loss of society and comfort.  *See Kaplan v. Hezbollah,* 213 F. Supp. 3d 27 (D.D.C. 2016) (solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort.") (*quoting Roth v. Islamic Republic of Iran,* 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (*quoting Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted*). See also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim. … Solatium is awarded to compensate the 'the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort.'") (citations omitted)).  An injured victim whose close relatives are also injured may receive both compensation for his or her own personal injury and solatium damages resulting from the injury to the close relatives.

*See Kaplan*, 213 F. Supp. 3d at 39.  A close relative need not be present at the attack in order to be eligible for solatium damages.  *See Cohen*, 2017 WL 818208, at \*7 ("Solatium claims are typically brought by family members who were not present or injured themselves."); *id*. at \*8 ("because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (*citing Braun*, —— F. Supp. 3d at —— , 2017 WL 79937, at \*10–11; *Ben–Rafael*, 540 F. Supp. 2d at 56–57).

The decisions in this district have adopted a general framework for the determination of solatium damages, but there has been some variation in the amounts awarded.  In situations where the victim has suffered physical (and not solely emotional) injury, several cases have awarded solatium damages ranging from $4 million for a spouse of the victim, $2.5 million for parents of the victim, and $1.25 million for siblings of the victim.  *See, e.g., Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012).  Courts have differed with respect to the proper amount to be awarded to children of victims.  Some courts have found that $1.5 million is appropriate for children of a surviving victim who was physically injured.  *Taylor v Islamic Republic of Iran*, 881 F. Supp. 2d 19, 23 n.3 (D.D.C. Aug. 2, 2012); *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23 (D.D.C. 2014).  Other decisions – applying reasoning that seems compelling and logical — have concluded that $2.5 million for children is a more appropriate amount.  *See Onsongo v. Republic of Sudan,* 60 F. Supp. 3d 144, 151 (D.D.C. 2014) ("children who lose parents are likely to suffer as much as parents who lose children.  Children of injured victims will thus be awarded $2.5 million."); *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 50 (D.D.C. 2014) (same); *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260

(D.D.C. 2014) ("[T]his Court has previously held that children of deceased and injured victims should receive awards akin to those given to parents (*i.e.*, $5 million where the victim died, and $2.5 million where the victim suffered injury)."). These amounts should be viewed as guideposts subject to variation based in part on the strength of the relationship between the victim and the relative and on whether the relative also experienced a physical injury in the same attack. *See Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 16 (D.D.C. 2012).

Courts have also considered the relationship between the solatium awards and the award to the victim for his or her pain and suffering. Several courts have concluded that it is inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the victims in situations where the family members were not direct victims of the attack. *See Davis,* 882 F. Supp. 2d at 15-16 ("[I]t is inappropriate for solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen.") (*citing Bland v. Islamic Republic of Iran,* 831 F. Supp. 2d 150, 157 (D.D.C. 2011*); O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 47 (D.D.C. 2012)).

Some courts have permitted multiple solatium awards to a single individual where multiple family members were injured or killed. In *Valore* the court awarded separate solatium awards to a plaintiff whose husband and brother were both killed in an attack. In addition, in light of evidence of the extent to which that plaintiff's life was devastated as a result of this dual loss, the court enhanced the standard solatium award for the loss of a sibling. *Valore*, 700 F. Supp. 2d at 86 (describing the "tragic double loss" and increasing award relating to brother to $3.125 million added to award of $8 million relating to loss of husband). Similarly, in *Owens v. Republic of Sudan*, 71 F. Supp. 3d 253 (D.D.C. 2014), the court awarded damages of $6.5 million to each of two daughters, comprised of $5 million for the death of their mother and $1.5

million for injury to their father. *Id.* at 261 n.4. The court applied the principle that it is inappropriate for the solatium award of a family member to exceed the pain and suffering award of the surviving victim by reducing the award related to the injury to the father to $1.5 million from the standard $2.5 million since the father had only been awarded $1.5 million in pain and suffering damages. *Id.* ("The special master actually recommended that each of Howard's daughters receive $7.5 million in solatium damages, because their mother … died in the bombing, which entitles them to an additional $5 million under this District's solatium-damages framework. This $5 million award is entirely appropriate, and the Court's reduction of their award applies only to the solatium damages stemming from their father's injury. The Court therefore awards each daughter $6.5 million in solatium damages: $5 million based on their mother's death and $1.5 million based on their father's injury.") (*citing Valore, supra.*, as awarding damages for each lost relationship).

Other decisions, however, have expressed concern about combining multiple solatium awards. In *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012), the court stated that it had not previously "specifically considered whether a family member entitled to a solatium award should receive an independent solatium award for *each* family member killed or injured." *Id.* at 39. The court expressed concern that "combining multiple solatium awards would cause family members of attack victims to recover larger solatium awards than most direct terrorist attack victims recover in pain and suffering damages." *Id.* at 39-40 (*citing Davis*, 882 F. Supp. 2d at 15-16) (*citing Bland*, 831 F. Supp. 2d at 157-58; *O'Brien*, 853 F. Supp. 2d at 47-48 ("[I]t is inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen.")). The court concluded that the "better" approach is to adopt and then enhance the "higher" standard award applicable in the situation. *Wultz*, 864

F. Supp. 2d at 40.  Thus, while a plaintiff in the case could have been entitled to $5 million as the mother of a deceased victim plus a separate $4 million as the spouse of a surviving victim, the court concluded that a $6 million award was appropriate.  *Id.* (using the higher $5 million as a baseline and adjusting upward by 20%).  Likewise, while another plaintiff in *Wultz* would have been entitled to $1.5 million as the daughter of a survivor and $2.5 million as the sister of the decedent, the court concluded that a $3.5 million award was appropriate (using the higher $2.5 million as a baseline and adjusting upward by 40%).  *Id*. at 40-41.[2]

Similarly, in *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 39 (D.D.C. 2016), the court adopted the special master's recommendation to grant a solatium award for only one victim rather than for both victims.  The court found that the special master "was careful to avoid any duplication of damages which potentially might run afoul of the holding" in *Wultz* (that rather than family members being entitled to independent solatium award for each family member killed or injured, the better practice would be to establish the family member's baseline at the higher of the figures).  "[I]n keeping with th[at] holding," the special master recommended solatium awards to a husband and wife but denied an additional solatium award for the trauma endured by their daughter.  *Id*.  The special master had concluded that the question of whether a family member may be entitled to solatium damages for the trauma they suffered as a result of injuries inflicted on more than one family member was resolved in *Wultz*, where the court expressed the concern that it would offend the principle that solatium awards should not exceed pain and suffering awards of survivors.  *See* Report of Special Master Pursuant to Order of

---

[2] The court also found that a third plaintiff in the case who was entitled a single solatium award – the father of the deceased victim who had himself been severely injured in the attack and watched his son's body "shredded by bomb shrapnel" and spent 27 days in great distress watching his son slowly pass away – was entitled to a $7 million solatium award (an upward departure of 50% from $5 million).

Reference Regarding the Claims of Brian, Karene, Mayan, Noa, Netiya, and Ariel Erdstein, at 28-29, *Kaplan v. Hezbollah*, No. 1:09-cv-00646-RCL (D.D.C. Apr. 4, 2016), ECF No. 75.  The special master in *Kaplan* reasoned that while the parents "theoretically" were "entitled to an award of solatium damages arising both from the anguish they suffered due to each other's trauma as well as due to the trauma endured by" their daughter, "any such duplication of damages would potentially run afoul of the principles articulated in *O'Brien* and in *Wultz*." *Id.* at 29.  The special master recommended (and the court adopted) an award representing the higher figure of $1 million (arising from the mental anguish of spouse) "in deference to *Wultz*."  *Id.* ("With respect to *O'Brien*, the Special Master must ensure any award for solatium damages not exceed the pain and suffering of the injured party.…  In deference to *Wultz*, the Special Master will fashion an award representing the 'higher of the figures.'") (citation omitted).  Neither the court nor the special master explained why separate solatium awards for injuries to a spouse and a child constitutes "duplication."

26

**Recommended Awards**

**Damages for Physical Injury/Pain and Suffering for Ora, Shira, Orly, Meirav, Daniel, and Elchanan Cohen:**

Plaintiffs assert that each of the Cohens suffered severe physical and emotional damage, and in each case their injuries warrant an upward adjustment of the baseline amount generally awarded to victims of terrorist attacks.  In reviewing the testimony, I note significant differences in the severity of the physical injuries and the nature and severity of the emotional distress suffered by the individual family members.  In evaluating the recommended amounts of damages, I have considered the amounts awarded in other cases and compared the injuries in those cases to the injuries suffered by the individual members of the Cohen family.  The recommended awards and the rationale for the recommendation for each plaintiff are outlined below.

*Ora Cohen.*  Ora Cohen suffered a broken nose, an injury to her neck and significant damage to her eardrum.  According to her testimony and the medical records provided, she continues to suffer some hearing loss, although she did not quantify the degree of impairment.  She had multiple surgeries, although she did not provide details about the reason for the surgeries, the duration, the hospitalization, the result or the pain and suffering associated with the surgeries.  Both the testimony and the records demonstrate that Ora suffered significant emotional distress: she was separated from her children and husband and for several hours,  she did not know whether all her children were alive or the extent of their injuries.  She testified to the extreme distress and stress she felt when she discovered the extent of Shira's injuries and the difficult medical decisions that were required.  She was diagnosed with PTSD and depression more than a year after the attack.  In evaluating the appropriate measure of damages, it is appropriate to take into consideration the fact that Ora Cohen focused her attention on caring for her injured family

105813588v.7

rather than caring for herself.  The medical records indicate that her psychological injuries were severe but that she did not seek treatment for more than a year after the attack.  While Ora's physical injuries do not appear to be as severe as those that warranted the baseline award of $5 million in *Peterson II*, the combination of the physical injuries (which are not minor) and continue to affect her daily life more than a decade after the attack, the severe emotional injuries under these unique circumstances and the fact that she deferred her own treatment to assure proper care for her children warrants the 'baseline' award of $5 million.   I believe this recommended amount is comparable to awards in other cases involving more significant but not severe injuries coupled with emotional distress.  *See, e.g., Bland*, 831 F. Supp. 2d at 155-56 (plaintiff suffering from head injury, hole in eardrum, broken foot along with PTSD and mood disorders received award of $4.5 million); *Id.* at 155 (plaintiff with contusions and lacerations covering most of body, confined to wheelchair for a few weeks, partially disabled from PTSD received award of $4 million); *Wamai*, 60 F. Supp. 3d at 92-93 (noting awards of $3 million for plaintiff who suffered minor physical injuries but severe hearing loss in both ears and severe emotional damage and of $5 million to plaintiff who suffered severe shrapnel wounds and burns, severe hearing loss, and severe emotional distress).  Courts have awarded damages ranging from $1.5 million to $2.5 million to victims who suffered emotional injury without physical injury or with minor physical injury.  *See Kaplan*, at 37.  Courts have also awarded $3 million to $5 million to victims who suffered a mix of injuries, including serious hearing impairment.  *Wamai* at 92-93.

*Shira Cohen*.  Shira Cohen suffered severe wounds to her head as well as other parts of the body.  These wounds continue to cause pain.  She had broken teeth.  She suffered severe injury to one of her eyes.  The eye injury has affected her vision and the eye itself does not look

normal.  Shira's face has been disfigured by the wounds and she has suffered and continues to suffer severe emotional trauma as a result of this disfigurement.  She has had multiple surgeries but the surgeries will not eliminate or cure the injuries:  the injuries and disfigurement are permanent.  She continues to require treatments primarily for the injured eye.  She experiences fear and is often unable to sleep at night because of her fear.  Based on the nature of the injuries, the ongoing need for treatment more than a decade after the attack, the severe psychological impact and the permanence of the disfigurement, loss of vision and ongoing effects of glaucoma resulting from the trauma to the eye, I recommend that Shira Cohen receive an upward adjustment of 40% (or $2 million) from the "baseline" for a total pain and suffering award of $7 million.  This amount is reasonable in comparison to awards provided in other cases with injuries of similar severity.  *See Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 24 (D.D.C. 2016) (award of $6 million for severe flesh wounds, anxiety and fear along with permanent hearing loss); *Peterson II* at 54-56 (award of $5 million for plaintiff with broken jaw, severe flesh wounds, scars and loss of teeth; award of $5 million for plaintiffs with soft tissue damage, flash burns, back problems and scarring; award of $5 million for shoulder injury with persistent back, neck, and shoulder pain along with severe psychological problems; award of $7.5 million for loss of sight in one eye and shrapnel injuries).  *Compare Murphy v. Islamic Republic of Iran,* 740 F. Supp. 2d 51, 78 (D.D.C. 2010) ($7.5M award ~~in~~ for plaintiff who suffered severe and multiple injuries, including "an impaled rectum by an object that split his sphincter and pierced his stomach; [a] crushed kidney; [a] fractured pelvis; [a] detached ear; cuts and abrasions over 80 to 90% of his body; [the wearing of a] colostomy bag for 11 months[,] and damage to his legs and feet that confined him to a wheelchair for many months.") (citations omitted)); *Dammarell* at 294-96 ($7 million award for plaintiff who suffered a loss of an eye along with multiple broken bones, nerve damage and was in a coma for four to five days.).

*Orly Cohen.*  Orly Cohen suffered shrapnel wounds and still experiences pain from glass shards that remain in her body.  Orly has scars from her injuries, some loss of hearing, and ongoing distress and fear of terrorist attacks.  Orly was hospitalized for nine days after the attack. Although Orly's testimony and the medical documents provided indicate that she continues to experience effects of the attack, the evidence provided indicates that the injuries are less severe than the types of injuries that have resulted in the $5 million baseline award.  Accordingly, I recommend a downward adjustment from the baseline and an award of $3 million.  This amount is consistent with awards for comparable injuries in other cases.  *See, e.g., Peterson II* at 55, ($3 million award for lacerations and back injuries leading to chronic back pain); *Wamai*, 60 F. Supp. 3d at 92 (award of $2.5 million for plaintiffs who suffered broken bones, head trauma, some hearing or vision impairment, or impotence (*e.g.*, plaintiff who continues to suffer from partial vision impairment, which has persisted even through reparative surgery, and who also suffers from severe emotional damage)); *Davis*, 882 F. Supp. 2d at 16 (award of $2 million for serviceman who suffered hearing loss and severe PTSD).

*Meirav Cohen.*  Meirav Cohen suffered injuries to her ears, has impaired hearing, pain and ringing in the ears, and frequent ear infections that affect her ability to conduct her daily life. She was hospitalized for nine days after the attack.  She testified to trauma related stress that manifests in skin rashes.  She has scars on her face, leg, and arms.  She had psychological problems for a substantial period of time after the attack.  The medical records document severe hearing loss – described as a "deep disability" in one ear and moderate to severe in the other ear. She has ongoing hearing impairment that interferes with her daily life.  Based on the permanent scarring and the evidence of apparently untreatable and ongoing and frequent pain and ringing in the ears, severe hearing loss and serious ear infections that have a detrimental effect on ordinary

105813588v.7

activities of daily life, Meirav's injuries are generally comparable to those injuries that resulted in the $5 million baseline award in *Peterson*. I recommend an award of $5 million following the guidance in *Peterson II*. *See also Wamai*, 60 F. Supp. 3d at 92-93 ($5 million award level for plaintiff who spent a month in the hospital with severe shrapnel wounds and burns and suffered severe hearing loss and emotional damage).

*Daniel Cohen.* Daniel Cohen suffered a laceration injury that was treated at the hospital. He has some scarring from shrapnel wounds. Daniel was hospitalized for nine days after the attack. Based on his testimony, Daniel suffers from ongoing hearing issues that include ringing in the ears. Daniel testified to significant psychological effects, including insomnia and withdrawal from social interaction. Based on the testimonial evidence of ongoing physical effects and more severe emotional and psychological effects, and guided by the determinations in other cases, I recommend an award of $3 million. This amount is consistent with determinations in other cases. *See Wamai*, 60 F. Supp. 3d at 92 (plaintiff who suffered minor physical injuries but severe hearing loss in both ears that continues and severe emotional damages awarded $3 million); *Davis*, 882 F. Supp. 2d at 12-13 (court found appropriate pain and suffering award to be $2 million where plaintiff suffered hearing loss and severe PTSD as a result of the bombing); *Wamai*, 60 F. Supp. 3d at 92 (plaintiffs received $2.5 million award who had some hearing or vision impairment and emotional damage, such as plaintiff who suffered minor lacerations and continued to suffer partial vision impairment after reparative surgery). *Compare Wultz,* 864 F. Supp. 2d at 39 ("Tuly suffered shrapnel wounds in his legs, forehead, face, and scalp, a fractured left tibia, and ruptured eardrums. A nail was removed from his right leg. Today, he continues to have an abnormal gait, constant ringing in his ears, little sense of smell and taste, and lower back pain…. Based on the serious nature of Tuly's injuries and in light of awards in similar cases, this

Court finds that he is entitled to a baseline award of $5 million for his substantial physical pain and suffering.").

*Elchanan Cohen.*  The testimony indicates that Elchanan suffered a broken hip – Elchanan does not recall the injury and there is no medical documentation of the injury.  Further, the injury apparently did not require treatment and has not had any ongoing effect.  The fact that Elchanan does not recall the injury or suffer long-term effects does not preclude a damages award.  *See Braun v. Islamic Republic of Iran,* __ F. Supp. 3d __, 2017 WL 79937, at *8 (D.D.C. Jan. 9, 2017) (survival damages of $1 million awarded to estate of infant killed in attack where averments that infant was thrown from stroller and survived for 2 hours "suffice to demonstrate she experienced pain and suffering resulting from the Attack and prior to her death").  The evidence shows that Elchanan was left in the bus for hours after the attack, buried under one or more bodies and, in fact, suffered an injury.  The medical records provided indicate that Elchanan's hearing has not been impaired.  Accordingly, I recommend that Elchanan receive an award of $750,000.  *See Dammarell*, 404 F. Supp. 2d at 292-98, 323-24 ($750,000 awards for plaintiff who had cuts on face and glass embedded in skin and for plaintiff who had temporary loss of sight in one eye and other minor injuries).

**Solatium Damages for Ora, Shira, Orly, Meirav, Daniel, and Elchanan:**

I note initially that the plaintiffs have requested a damage multiplier because the entire family was involved in the attack.  The concept of such a multiplier, however, seems duplicative of solatium damages, and, accordingly, the recommendation addresses only solatium damages for each plaintiff individually.  In their complaint, plaintiffs request solatium awards comprised of an amount for the injuries to each of the family members.

In general, there is a presumption that family members suffer grief and emotional injury as a result of a terrorist attack on another family member.  *See Kaplan*, 213 F. Supp. 3d at 38 ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish[,] … and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (*quoting Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015) ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. …  As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted)).  The general purpose of terrorist acts is to foster long-term emotional injury in addition to physical injury and death.  *See Kaplan*, 213 F. Supp. 3d at 38.  Accordingly a plaintiff who provides testimony about the effect on him or her of the attack on a family member is eligible for an award of solatium damages – provided that the relationship is sufficiently close. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015) (declaration supported awarding solatium damages consistent with *Heiser* framework).

Here, each plaintiff has provided compelling testimony about the close relationship among the members of the Cohen family including Ora Cohen's parents and sisters. Accordingly, each of the plaintiffs is entitled to solatium damages. The complaint in the case requests additive solatium damages in the amount of $10 million for each family member. Under this formulation, each family member would receive a solatium award of $60 million. As discussed above, there is a limit to solatium damages and, as explained below, the additive approach applied here would result in awards that far exceed the amounts that typically would be awarded for the actual pain and suffering of the underlying victim. Following is a discussion of my recommendations regarding solatium damages and the basis for each proposed award.

**<u>Recommended Approach for Solatium Award for Ora Cohen</u>**:

Ora Cohen's testimony demonstrates the extreme grief and distress she experienced and continues to experience as a result of the injuries to her children. Further, her testimony demonstrates the grief and loss of companionship of her husband – who suffered relatively severe physical injuries and significant emotional injuries as a result of the attack. Ora Cohen has – for close to 15 years – devoted her life to caring for her children's physical and emotional injuries. Solatium damages are particularly appropriate in Ora's situation. Ora's testimony credibly documents her experiences of grief and distress resulting from the severe injuries suffered by her children and spouse and the long-term effect of the attack on her children. Using the standard amounts awarded for solatium damages, the award to Ora Cohen would consist of: $4 million for the injuries to her then-husband; $2.5 million for each of the 4 children who suffered long-term injuries plus $750,000 for the injuries to Elchanan (based on the principle that the solatium award should not exceed the pain and suffering award of the victim). The total solatium award using this methodology without regard to the limitation concept articulated in

105813588v.7

*Kaplan* and *Wultz*, would be $14,750,000.  Courts have, however, consistently noted and

recognized that there are "limits" on the amount of non-pecuniary damages, and courts

considering damages arising out of terrorist attacks have also recognized a need for general

consistency.  *See Wamai,* 60 F. Supp. 3d at 91 ("the Court must take pains to ensure that

individuals with similar injuries receive similar awards") (*quoting Peterson II*, 515 F. Supp. 2d at

54).  An award that is based on simply adding separate standard awards for each of the family

members injured would result in a solatium award that appears excessive and inconsistent when

compared to awards issued in other cases.  For example, among the highest solatium awards

issued in recent years involved the death of both the plaintiff's spouse and brother – the two

family members with whom she had the closest personal relationship.  The plaintiff was

devastated by the double loss.  That solatium award totaled $11.125 million.  *See Valore*, 700 F.

Supp. 2d at 86.  Accordingly, I recommend application of the "enhancement" approach based on

the reasoning in *Wultz*.  The highest solatium amount in this case would be $4 million – for the

injuries to Ora Cohen's then-spouse.[3]  As in *Wultz*, I recommend enhancing that amount by 20%

(or $800,000) and for each of the four children whose recommended awards for their own pain

---

[3] Shalom Cohen is not entitled to an award of pain and suffering because he does not qualify for
such an award under the statute.  The case law that limits the solatium awards to the amount
awarded to the underlying victim for his or her pain and suffering is intended to avoid a result
where the direct victim receives less than a family member who was not even present or injured.
That reasoning does not seem applicable here:  Shalom Cohen, in fact, suffered direct injuries in
the attack and would, if he were eligible under the FSIA, receive a substantial award that likely
would exceed the applicable solatium award.  Accordingly, it is reasonable to use the standard
solatium amount for injuries to a spouse as the baseline for determining the aggregate solatium
award for Ora Cohen.  *See Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 27, 30
(D.D.C. 2008) (court held that it lacked jurisdiction over a wrongful death claim brought by the
estate of Rabbi Meir Kahane because he was not a U.S. national, but found that the claims
brought by his family members in their individual capacities "remain valid" since "Section
1605A(a)(2)(A)(ii) requires only that either the claimant *or* the victim be a U.S. national at the
time the act of terrorism occurred, and awarding $8 million for the wife's emotional distress and
loss of consortium, $5 million to his mother and children, and $2.5 million to his siblings in
accordance with *Peterson*).

and suffering exceeds that amount as well as an enhancement of $750,000 for Elchanan (based on the principle that the solatium award should not exceed the pain and suffering award for the underlying victim).  The total solatium award for Ora Cohen using this method would be $7,950,000.[4]

**Recommended Approach for Solatium Awards for Shira, Meirav, Orly, Daniel and Elchanan Cohen:**

Each of the children testified about the effects on their daily life and family life primarily resulting from the effect of the attack on their mother, Ora, and, in some cases, the effect of the attack on their sibling Shira.  There was a brief mention in some of the testimony to the injury to the father but, in general, the focus of the testimony was on their relationship with their mother and the fact that the family had become dysfunctional.  The analysis above with respect to the solatium award for Ora Cohen applies to the computation of a solatium award for each child.  Accordingly, I recommend application of the *Wultz* approach – applying an enhancement factor to a baseline award rather than adding together amounts representing an award for each family member.  In light of the testimony, I recommend a single enhancement factor for the injuries to all of the siblings of each child.  Based on the testimony, I further recommend that the solatium awards for each child should be the same.  Accordingly, for each child, I have adopted as the baseline award the solatium amount generally applied for the injuries to a parent (in this case, Ora Cohen) – $2.5 million – and propose an enhancement of 40% of that amount ($1 million) for

---

[4]  While courts have been concerned that solatium awards not exceed the amount awarded to the individual victim upon which the solatium award is based, the language in *Wultz* is broader and indicates that solatium awards in general should not exceed amounts generally awarded to seriously injured victims.  *See Wultz*, 864 F. Supp. 2d at 39-40.  The mechanism adopted in *Wultz* – applying an enhancement rather than an additive process – achieves that objective.

the injuries to the father, and another 40% ($1 million) for the injuries to all of the other four siblings.  The total solatium award for each child would thus be $4.5 million.

   *Elchanan Cohen.*  The various decisions awarding emotional distress and solatium damages to children do not always provide details about the age of the children.  In general, however, since solatium damages in this context include loss of society and comfort and because such a loss could continue after the attack and in fact are clearly intended by the terrorist organization to continue long after the attack, children who were too young to recall the attack and experience their own and their relatives' trauma at the time may, nevertheless, be harmed because of the ongoing trauma experienced by their relatives.  *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C. 1998), *abrogation recognized Hartford Fire Ins. v. The Socialist People's Libyan Arab Jamahiriya,* 2007 WL 1876392 (D.D.C. 2007) (discussing solatium damages under prior version of the statutory state-sponsored terrorism exception to foreign sovereign immunity and stating:  "A separate loss which is encompassed within solatium is the loss of decedent's society and comfort. … 'Society' has evolved to include 'a broad range of mutual benefits which 'each family member' receives from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection.'") (citation omitted)).  Elchanan testified that it was hard growing up in his household because his mother had to keep going to treatments with Shira, and he keeps thinking about how hard it is for his mother to travel so much and help Shira.  He knows that his sister is in a lot of pain as a result of the attacks.  I recommend that Elchanan receive a solatium award of $2.5 million for the grief and loss associated with the injuries to Ora Cohen plus an additional amount of $2 million for the ongoing grief and loss associated with the severe injuries to his father and four siblings.

*Meirav Cohen.*  Meirav provided testimony on the impact she suffered as a result of her parents' injuries; Meirav described her parents as dysfunctional when they returned home; and she explained that her mother was not able to hear well and that her father was detached.  I recommend that Meirav receive a solatium award of $2.5 million for the grief and loss associated with the injuries to Ora Cohen plus an additional amount of $2 million for the ongoing grief and loss associated with the severe injuries to her father and four siblings.

*Orly Cohen.*  Orly testified that she feels bad for her sister Shira, that her household is very difficult and that her mother is preoccupied with Shira.  It is hard for her to look at her father because of his facial injuries.  I recommend that Orly receive a solatium award in the amount of $2.5 million for the loss and grief associated with the injuries to Ora Cohen plus an enhancement of $2 million for the loss and grief associated with the injuries to her father and four siblings.

*Daniel Cohen.*  Daniel recalls seeing his mother on the floor and saw his father crying, and he testified that his parents were not really able to take care of him after the attack.  He also testified that it is hard for him to look at his sister Shira and he is very sad about Shira's injuries.  I recommend that Daniel receive a solatium award in the amount of $2.5 million based on the loss of normal parental guidance, care and comfort from his mother plus an enhancement of $2 million for the loss and grief associated with the injuries to his father and four siblings.

*Shira Cohen.*  Shira testified that her mother is upset because of her own injuries.  Although Shira's testimony did not focus on the effects on her siblings, the severity and permanence of Shira's injuries makes the effect of her mother's distress and grief and the general dysfunction in the family more acute.  Accordingly, I recommend a solatium award consisting of

$2.5 million related to the grief and loss relating to Ora's injuries plus enhancement of $2 million

for the loss and grief associated with the injuries to her father and her four siblings.

**Solatium Damages for David Shalom Cohen, Ronit Mohaber, Orly Mohaber, Shokat Sadian, and Estate of Neira Mohaber:**

*David Shalom Cohen.*  His testimony demonstrated the extreme grief and distress he

experienced and continues to experience as a result of the injuries to his children.  He did not

know if his daughter Shira was alive and was erroneously told that his youngest child had died.

He was present (and injured) in the attack and saw his then spouse and his children with their

injuries shortly after the attack.  While it appears that Shalom Cohen's own emotional injuries

affected his involvement with his children in the years after the attack, it is also clear that in the

immediate aftermath of the attack he was severely affected by the injuries to his then-wife and

children.  In the complaint, Shalom Cohen requested an award of solatium in the aggregate

amount of $60 million (as explained above).  Shalom Cohen later requested an award of $2.5

million plus an upward adjustment in light of his close proximity to the family.  *See* Plaintiffs'

Proposed Findings of Fact and Conclusions of Law in Support of Their Motion for Default

Judgment at 30 n.10, ECF No. 34-2.  It is not clear why the solatium request is lower than the

amount generally provided for injuries to spouses and, apparently, it does not account for the

injuries to the children.  The evidence in the record is consistent with a solatium award that

follows the reasoning applied to the recommended solatium award for Ora Cohen.  Accordingly,

I recommend a solatium award consisting of $4 million for the grief and loss associated with the

injuries to his then-spouse and an upward adjustment of 20% for the four children whose own

damages exceed $800,000 as well as an additional amount of $750,000 for solatium damages

related to Elchanan – for a total of $7,950,000.

*Ronit Mohaber and Orly Mohaber.*  Ronit Mohaber and Orly Mohaber testified in detail about the close nature of their relationship with their sister Ora and how deeply the attack affected them on a daily basis.  The testimony satisfies the threshold test and provides a sufficient basis for an award of solatium damages for the injury to their older sister Ora.  I recommend a solatium award for Ronit and Orly of $1.25 million each in accordance with the standard set forth under the *Heiser/Peterson* framework.

*Shokat Sadian and Estate of Neria Mohaber.*  Shokat Sadian, Ora's mother, did not testify.  Neria Mohaber is deceased.  The testimony of Ronit and Orly Mohaber evidences the extremely close relationship between Ora and her parents and the grief and distress both of Ora's parents experienced when they learned of the attack and the injuries to Ora and to their grandchildren.  *See Moradi*, 77 F. Supp. 3d at 72.  Accordingly, consistent with the standard under the *Heiser/Peterson* framework, I recommend solatium damages for each of Shokat and the estate of Neira Mohaber of $2.5 million.

## Prejudgment Interest

It is within the Court's discretion to award plaintiffs prejudgment interest from the date of the attack until the date of final judgment.  *Baker v. Socialist People's Libyan Arab Jamahirya,* 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  "The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations."  *Id.* (citations omitted).  "Courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries— including, specifically, where such injuries were the result of targeted attacks perpetrated by

foreign defendants." *Id. (quoting Pugh v. Socialist People's Libyan Arab Jamahiriya,* 530 F.

Supp. 2d 216, 263 (D.D.C. 2008).

Several decisions in this Circuit have held that prejudgment interest is appropriate on

pain and suffering and solatium awards. *See Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 98

(D.D.C. 2014); *Khaliq v. Republic of Sudan,* 33 F. Supp. 3d 29, 34-35 (D.D.C. 2014); *Amduso v.*

*Republic of Sudan,* 61 F. Supp. 3d 42, 53  (2014); *Osongo v. Republic of Sudan*, 60 F. Supp. 3d

144, 153 (D.D.C. 2014); *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 46 (D.D.C. 2014);

*Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 261 (D.D.C. 2014); *Baker*, 775 F. Supp. 2d at

86; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009).  As the court in

*Wamai* reasoned:

> Awards for pain and suffering and solatium are calculated without reference to the
> time elapsed since the attacks. Because plaintiffs were unable to bring their claims
> immediately after the attacks, they lost use of the money to which they were
> entitled upon incurring their injuries. Denying prejudgment interest on these
> damages would allow defendants to profit from the use of the money over the last
> fifteen years. Awarding prejudgment interest, on the other hand, reimburses
> plaintiffs for the time value of money, treating the awards as if they were awarded
> promptly and invested by plaintiffs.

*Wamai*, 60 F. Supp. 3d at 98.  *See also Baker*, 775 F. Supp. 2d at 86 ("Prejudgment interest is

entirely appropriate in this case, and necessary to fully compensate the victims for the injuries

they sustained as a result of Syria's material support of ANO. Such awards compensate the

victims for any delay due to litigation, and prevent Syria from profiting from its terrorist

attacks.");  *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C.

2013) ($5 million baseline award for pain and suffering calibrated to compensate for their

"physical injuries and emotional distress without considering the length of time elapsed since the

attack; the Court would use a $5 million baseline without adding interest had this litigation taken

place in the months after the attacks. But plaintiffs were unable to bring their claims immediately

after the attacks, and have hence lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last three decades.").

Several of these decisions awarding such prejudgment interest have found that interest at the prime rate is appropriate. *See Wamai,* 60 F. Supp. 3d at 98; *Khaliq,* 33 F. Supp. 3d at 34; *Owens*, 71 F. Supp. 3d at 261. As explained by the court in *Amduso* in calculating interest using the prime rate for each year:

> The D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest. … Although the prime rate, applied over a period of several years, can be measured in different ways, the D.C. Circuit has approved an award of prejudgment interest "at the prime rate for each year between the accident and the entry of judgment." See *id.* Using the prime rate for each year is more precise than, for example, using the average rate over the entire period.

*Amduso*, 61 F. Supp. 3d at 53 (*citing Forman v. Korean Air Lines Co.,* 84 F.3d 446, 450 (D.C. Cir. 1996)). *But see Belkin*, 667 F. Supp. 2d at 24 (awarding prejudgment interest on solatium claim computed at a rate of six percent per annum on a simple interest basis from date of incident to present); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 215 (D.D.C. 2012) (prejudgment interest computed at a rate of six percent per annum on a simple interest basis).

Other decisions, however, have declined to issue such prejudgment interest on pain and suffering or solatium awards. *See Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 43 (2012) (delays in case were not significant and "in determining the solatium, pain and suffering, and economic loss awards in this case, the Court has attempted to fully compensate plaintiffs' through today's date" and thus finds no equitable grounds for awarding prejudgment interest; "Whether to award prejudgment interest is a question that rests within this Court's discretion,

subject to equitable considerations. … Because this Court has applied the framework in *Heiser* to

its calculation of solatium damages, prejudgment interest is not appropriate for these awards.");

*Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 45 (D.D.C. 2012) (stating

"[w]hen this Court applies the *Heiser* and *Peterson II* damages framework, it does not typically

award prejudgment interest" and denying request for prejudgment interest in case awarding pain

and suffering and solatium damages where significant portion of delay was caused by plaintiffs'

failure to timely submit necessary documents to the special master); *Wyatt v. Syrian Arab*

*Republic,* 908 F. Supp. 2d 216, 232 (D.D.C. 2012) ("In this case, pain and suffering and solatium

damages are both designed to be fully compensatory.  Prejudgment interest is not appropriate

and will be denied.").  For example, in *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22,

54 (D.D.C. 2016), the court stated that "nonpecuniary damages, such as solatium damages, do

not typically require prejudgment interest because they are 'designed to be fully compensatory.'"

(citations omitted).  The court noted that while some courts have awarded prejudgment interest

on nonpecuniary awards, noting the loss of the use of money had the plaintiffs been able to bring

the suit closer to the triggering event, there was no evidence that the delay between when the

2005 terrorist attacks occurred and 2012 (when the instant suit was filed) "was due to any

nefarious interference by the defendants or anyone else" and, therefore, "the solatium damages

awarded are complete and prejudgment interest is not necessary to make the plaintiffs whole."

*Id.* at 54-55.  *See also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 407 (D.D.C. 2015)

("the Court does not award prejudgment interest on solatium damage awards that are based on

the *Heiser* framework."); *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C.

2012) ("when this Court applies the *Heiser* damages framework—as it did in the underlying

solatium award here—it has consistently refused to award prejudgment interest." (citations

omitted)); *Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011)
(declining to award prejudgment interest on solatium damages).

In general, it seems that the reasoning of the cases that have declined prejudgment
interest is reasonable.  The recommended awards are substantial and, as many courts have
concluded, fully compensatory.  However, I have provided a calculation of prejudgment interest
for each plaintiff in the event that the Court determines that such an award is appropriate.
Prejudgment interest is calculated herein at the prime rate for each year between the incident and
the entry of final judgment using the methodology described in *Amduso*.  *See Amduso*, 61 F.
Supp. 3d at 53.  A multiplier was calculated using the Federal Reserve's data for the average
annual prime rate in each year since 2003.  *See Bd. of Governors of the Fed. Reserve Sys.
Historical Data*, available at http://www.federalreserve.gov/releases/h15/data.htm (last visited
July 2, 2017).  As of July 3, the Federal Reserve has not posted the annual prime rate for 2017,
so, the rate was estimated to be 3.295%, the rate for the previous six years.  *See Amduso*, 775 F.
Supp. 2d at 53 n.11.  Consistent with *Amduso*, to calculate the multiplier, the Special Master
multiplied $1.00 by the prime rate in 2004 (4.34%) and added that amount to $1.00, yielding
$1.04.  Then, that amount was multiplied by the prime rate in 2005 (6.19%) and added that
amount to $1.04, yielding $1.11.  Continuing this iterative process through 2017 yields a
multiplier of 1.816844.  *See id.* at n.11.  "The product of the multiplier and the base damages
amount includes both the prejudgment interest and the base damages amount; in other words,
applying the multiplier calculates not the prejudgment interest but the base damages amount plus
the prejudgment interest, or the total compensatory damages award."  *Id.* at 54 n.13.

105813588v.7

### Summary of Recommendations

| | Pain and Suffering – Physical Injuries and Emotional/Psychological Distress Damages | Prejudgment Interest on Pain and Suffering | Solatium | Prejudgment Interest on Solatium | Total Without Prejudgment Interest | Total With Prejudgment Interest |
|---|---|---|---|---|---|---|
| **Ora Cohen** | $5,000,000 | $4,084,219 | $7,950,000 | $6,493,908 | $12,950,000 | $23,528,127 |
| **Meirav Cohen** | $5,000,000 | $4,084,219 | $4,500,000 | $3,675,797 | $9,500,000 | $17,260,016 |
| **Daniel Cohen** | $3,000,000 | $2,450,531 | $4,500,000 | $3,675,797 | $7,500,000 | $13,626,328 |
| **Orly Cohen** | $3,000,000 | $2,450,531 | $4,500,000 | $3,675,797 | $7,500,000 | $13,626,328 |
| **Shira Cohen** | $7,000,000 | $5,717,906 | $4,500,000 | $3,675,797 | $11,500,000 | $20,893,703 |
| **Elchanan Cohen** | $750,000 | $612,633 | $4,500,000 | $3,675,797 | $5,250,000 | $9,538,430 |
| **Shalom Cohen** | $0 | $0 | $7,950,000 | $6,493,908 | $7,950,000 | $14,443,908 |
| **Shokat Sadian** | $0 | $0 | $2,500,000 | $2,042,109 | $2,500,000 | $4,542,109 |
| **Estate of Neria Mohaber** | $0 | $0 | $2,500,000 | $2,042,109 | $2,500,000 | $4,542,109 |
| **Orly Mohaber** | $0 | $0 | $1,250,000 | $1,021,055 | $1,250,000 | $2,271,055 |
| **Ronit Mohabber** | $0 | $0 | $1,250,000 | $1,021,055 | $1,250,000 | $2,271,055 |

### Punitive Damages

"The language of FSIA specifically 'provides courts with the power to award punitive damages against an agency or instrumentality of a foreign state in a case' brought pursuant to 28 U.S.C. § 1605A." *Bluth*, 203 F. Supp. 3d at 25 (*quoting Weinstein*, 184 F. Supp. 2d at 24). Therefore, the Court has the power to award punitive damages to Plaintiffs on their section 1605A claims. *Id.* "To calculate the proper punitive damages award, the Court considers 'four factors: (1) the character of the defendants' act; (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause; (3) the need for deterrence; and (4) the wealth of the defendants.'" *Id.* (*quoting Moradi*, 77 F. Supp. 3d at 73; *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 24 (D.D.C 2002) (*citing* Restatement (Second) Torts § 908)).

45

Courts have adopted several approaches to the calculation of punitive damages under section 1605A of the FSIA. *See, e.g., Fraenkel v. Islamic Republic of Iran*, __ F. Supp. 3d __, 2017 WL 1214353, at *15 (D.D.C. March 31, 2017).

Under one approach, courts impose a fixed amount, although the amount may differ. *Compare Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 122 (2015) (stating under this approach, "some courts impose a fixed $300 million punitive award. This approach is based on courts' perception that punitive awards are converging toward this figure, and on the theory that consistent, foreseeable punishment serves as a better deterrent for the rational bad actor.") (citations omitted) with *Braun*, __ F. Supp. 3d __, 2017 WL 79937, at *14 (describing the approach as awarding "a fixed amount of $150,000,000 per affected family" and then awarded that amount) (*citing Wyatt*, 908 F. Supp. 2d at 233 (awarding $300,000,000 in total to two victims and their families); *Baker*, 775 F. Supp. 2d at 86 (awarding $150,000,000 each to families of three deceased victims); *Gates*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (awarding $150,000,000 each to the estates of two victims)).

Under a second approach, "[m]any courts apply the *Flatow* method, multiplying the defendant state's annual expenditures on terrorism (the multiplicand) by a factor usually ranging from three to five (the multiplier)." *Flanagan,* 87 F. Supp. 3d at 122 (citations omitted). The *Flanagan* court found that Iran's support for terrorism was estimated in 2008 to amount to $200 million. *Id.* at 123. Significantly, however, the court noted several points of disagreement under this approach:

> In applying the *Flatow* method, courts disagree on whether terrorism spending should reflect, on the one hand, spending at the time of the attack at issue (or at least in years immediately prior to the attack) or, on the other, annual spending at the time of litigation. *Compare Roth v. Islamic Republic of Iran*, No. 11–cv–1377 (RCL), 78 F. Supp. 3d 379, 406, 2015 WL 349208, at *18 (D.D.C. Jan. 27, 2015)

46

(using Iran's "annual material support to Hamas during the 1990s" as *Flatow* multiplicand for damages in case arising from 2001 terror attack), with *Sutherland v. Islamic Republic of Iran,* 151 F. Supp. 2d 27, 44, 53 (D.D.C. 2001) (finding that Iran "currently spends approximately $100 million per year or more on terrorist activities," in calculating damages in connection with captivity spanning from 1985 to 1991).  Additionally, some courts focus on spending directed at the terrorist organization that perpetrated the attack at issue, rather than total support of terrorism. *Compare Roth*, 78 F. Supp. 3d at 405–407, 2015 WL 349208, at *18 (isolating support to Hamas); *Valore*, 700 F. Supp. 2d at 88 (isolating support to Hizballah), with *Haim*, 784 F. Supp. 2d at 14 (using "annual support for international terrorism" as *Flatow* multiplicand).

*Flanagan*, 87 F. Supp. 3d at 123 n.31.[5]

Under a third approach, "[o]ther courts award punitive damages based on a ratio between punitive and compensatory damages." *Fraenkel*, 2017 WL 1214353, at *15 (*citing Spencer v. Islamic Republic of Iran,* 71 F. Supp. 3d 23, 31 (D.D.C. 2014)).  As recently stated by the court in *Gill v. Islamic Republic of Iran, __* F. Supp. 3d __, 2017 WL 1289938 (D.D.C. Apr. 6, 2017), "[t]he approach of using Iran's annual expenditures on terrorist activities, 'which may result in awards of billions of dollars, has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen.'" *Id*. at *13 (*citing Braun*, __F. Supp. 3d at __, 2017 WL 79937, at *14).  The court in *Gill* found that since "[t]he attack here was not an 'exceptionally deadly attack,' as there were no deaths, … and so far as the Court is aware, the only resulting injuries were the injuries sustained by the plaintiff," it was appropriate to "utilize a multiplicand in the same amount as the compensatory damages awarded—$7.5 million." *Id*.  The court then stated that "[t]he multiplier [other members of this Court have used] has ranged between three and, in exceptional cases, five." *Id.* (*quoting Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50 (D.D.C. 2012)).  The

---

[5] In *Flanagan*, the court found that both of these approaches failed to account for the facts of the case at issue since the court had already rendered a punitive damages award against the Republic of Sudan in connection with the same bombing of the USS Cole.  *Id*. at 124.

47

plaintiff in *Gill* requested a punitive damages award of $30 million, which would have required use of a multiplier of four, but the court noted that in *Harrison*, "three of the plaintiffs suffered similar injuries that also merited a compensatory damages award of $7.5 million, *see* 882 F. Supp. 2d at 48–49, and the *Harrison* court used a multiplier of three to determine punitive damages because it 'f[ound] no exceptional circumstances,' *id*. at 50.  Similarly, because the Court finds no exceptional circumstances in this case, it will use a multiplier of three, and award the plaintiff $22.5 million in punitive damages."  *Gill*, 2017 WL 1289938 at *13.

Also, note that in the 2016 *Bluth* decision the court found that "[g]iven the frequency of these attacks and the lack of any evidence that high awards have successfully deterred them … neither the large sum of $500 million requested by Plaintiffs nor the sum resulting from the expenditure-times-multiplier method is appropriate."  *Bluth*, 203 F. Supp. 3d at 26.  The court concluded that "[i]n view of the fact that it was Hamas, not Defendants, who actually committed the terrorist action, that [plaintiff] has suffered life-time injuries that were intended by Defendants, and that his family members were deeply affected by his physical, emotional, and psychological harms, the Court concludes that $25 million in punitive damages is appropriate." *Id*.

Plaintiffs cite to both the first and second approaches referenced above.  On the one hand, they argue that the proper level of punitive damages is "'based on a multiplied estimate of Iran's annual expenditures in support of terrorist activities.'"  Pl. Proposed Findings at 33 (*quoting Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 406 (D.D.C. 2015)).  Plaintiffs then cite a 2012 case referencing testimony from their expert, Dr. Clawson, who had previously declared that "the financial material support provided by Iran in support of terrorism is in the range of $300 million to $500 million a year."  *Id*. at 33 (*quoting Bodoff v. Islamic Republic of Iran,* 907 F. Supp. 2d

93, 105 (D.D.C. 2012)).   However, plaintiffs then state that "this Court frequently awards

punitive damages against Iran in the amount of $300 million for providing material support to

terrorist organizations, including Hamas."   *Id.* (*citing Beer v. Islamic Republic of Iran,* 789 F.

Supp. 2d 14, 25 (D.D.C. 2011); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C.

2012) (awarding $300 million in punitive damages); *Bodoff v. Islamic Republic of Iran,* 907 F.

Supp. 2d 93 (D.D.C. 2012) (same)).   Plaintiffs claim that "Plaintiffs are entitled to an award of

punitive damages in the amount of $300 million."   *Id.* at 33-34.

Note that the *Roth* and *Bodoff* cases cited by plaintiffs for the application of a multiplier

raise differences in methodology noted by the *Flanagan* court.   The 2012 *Bodoff* decision

(involving a 1996 bus bombing) did state that "Dr. Clawson declared that 'the financial material

support provided by Iran in support of terrorism is in the range of $300 million to $500 million a

year."   That was citing to a 2010 declaration where Dr. Clawson was giving information what he

believed Iran was spending as of that general time period and based on information, in part, from

the 2008 and post-2006 time periods.   *Bodoff*, 907 F. Supp. 2d at 105 (citing Clawson Aff. ¶ 4,

2010 WL 1954991, *Valore*, 700 F. Supp. 2d 52 (03–cv–1959, ECF No. 58)).   The *Bodoff* court,

however, did not appear to use a multiplier in its calculations.   The court stated that it found it

"appropriate to examine awards that courts have issued in similar state-sponsored terrorism

cases" and concluded based on such a review that it was appropriate to award plaintiffs $300

million in punitive damages.   *Bodoff*, 907 F. Supp. 2d at 105-06.

In the 2015 *Roth* decision – cited by plaintiffs for the proposition that a multiplier of

Iran's expenditures is appropriate – the court did apply a multiplier, but one based on a much

lower level of alleged annual support for Hamas by Iran from the 1990s.   The *Roth* court did

state that it "has repeatedly adopted a method for calculating an appropriate amount of damages

based on the magnitude of the defendant's support for terrorism" and "has generally considered an estimate of the defendant state's annual expenditure in support of terrorist organizations and applied a multiplier to it, usually between three and five." *Roth*, 78 F. Supp. 3d at 403-04. However, in that case the court, at plaintiff's urging, took judicial notice of evidence "in prior cases indicating that Iran provided between *$25 million and $50 million* in annual material support to Hamas *during the 1990s.*" *Id.* at 406 (emphasis added) (*citing Estate of Botvin*, 873 F. Supp. 2d 232, 238 (D.D.C. 2012) (recounting expert testimony from a CIA case officer that Iran provided $30 million per year to Hamas in the early-to-mid 1990s and testimony from Dr. Clawson that the support was equivalent to $25 million to $50 million per year in cash and material support)). The court in *Roth* adopted the mid-point range of $37.5 million and, concluding that a multiplier of three was appropriate, found plaintiffs entitled to $112.5 million in punitive damages. *Id.* The court did acknowledge in a footnote that this sum was "less than the punitive damages awarded in many other state-sponsored terrorism cases that also adopted the terrorism expenditure-multiplier method. Nonetheless, the Court declines to take notice of evidence that the plaintiffs have not urged it to consider. Also, this award is sufficient to achieve the policy objectives of punitive damages in section 1605A cases." *Id.* at 407 n.12.

If the court is inclined to award punitive damages, it is reasonable to consider both the amount of the compensatory damages and the general range of punitive damages awarded in other cases. The concept of multiplying the estimated amount of expenditures on terrorism as a basis to determine punitive damages is problematic because of conflicting or uncertain evidence and the question of determining the relevant time period. In this case, if the court accepts the recommendations, the aggregate amount of the compensatory award, without prejudgment interest, would be $69,650,000. That amount, multiplied by 3 – which is an approach applied in

several cases – yields a total of $208,950,000.  This compares favorably with the cases that have awarded a fixed amount of between $150,000 000 and $300,000 000.  Accordingly, I recommend that if the Court elects to award punitive damages, the Court consider an amount based on the underlying compensatory award.  The punitive award could be allocated among the plaintiffs based on the individual amount of damages awarded divided by the aggregate awarded to the entire family.

Respectfully submitted

By:  /s/ Deborah Greenspan
Deborah E. Greenspan, Esq.
Special Master
July 3, 2017

105813588v.7